*In re* LEON JENKINS

Docket No. 84205. Argued November 9, 1990 (Calendar No. 6).
    Decided January 23, 1991. Rehearing denied *post,* 1250.

The Judicial Tenure Commission filed a formal complaint with
    the Supreme Court against Leon Jenkins, Judge of the 36th
    District Court, alleging acceptance of bribes by a public official,
    false pretenses with the intent to defraud, solicitation of per-
    jury, and violation of the Code of Judicial Conduct, Canons 2A
    (impropriety and appearance of impropriety), 2C (permitting
    friends or family to influence judicial conduct), 3A(4) (improper
    ex parte communications), 5C(4) (improper acceptance of gifts),
    and 6C (failure to properly report income). Judge Jenkins was
    suspended with pay in the interim. Following a hearing, retired
    Judge R. Stuart Hoffius, acting as a master, issued his report
    finding the respondent guilty. The commission adopted the
    master's findings of fact and conclusions of law, concluding that
    the respondent had engaged in misconduct in office and conduct
    clearly prejudicial to the administration of justice, and recom-
    mended that the respondent be removed from office and perma-
    nently enjoined from serving in any judicial office.

In an opinion by Chief Justice CAVANAGH, joined by Justices
    LEVIN, BRICKLEY, BOYLE, RILEY, and GRIFFIN, the Supreme
    Court *held*:

Judge Leon Jenkins is removed from judicial office.

1. There is overwhelming evidence that from 1984 to 1987
    Judge Jenkins systematically and routinely sold his office and
    his public trust, committed acts which if proven in a criminal
    trial would constitute violations of three criminal statutes,
    committed wholesale violations of the most elementary canons
    of judicial conduct, and brought grave dishonor upon the judi-
    ciary. The master found the testimony against Judge Jenkins
    to be credible and persuasive, and properly took into account
    his failure to testify in his own behalf.

2. The master, by holding in accordance with MCR 9.211(B)
    that Judge Jenkins' failure to testify in his own behalf could be
    considered as an evidentiary fact, did not violate his Fifth
    Amendment right against self-incrimination. The privilege
    against self-incrimination generally prohibits use of statements

obtained under threat of dismissal in subsequent criminal proceedings. Assuming, arguendo, that this rule would apply in a judicial disciplinary proceeding, the issue whether any statement Judge Jenkins might have made would have been admissible at some future criminal proceeding will never arise because, in this case, he chose not to testify.

3. Judicial disciplinary proceedings are fundamentally distinct from all other legal proceedings, whether civil or criminal. While the Supreme Court might be inclined to find the exclusionary rule inapplicable to certain recorded conversations Judge Jenkins alleges were improperly admitted as evidence, it is unnecessary to reach that conclusion in this case. A judicial disciplinary proceeding may not be invalidated because of a nonprejudicial error or an error not resulting in a miscarriage of justice. In this case, the record contains more than ample evidence, apart from the disputed conversations, to support the findings of the master and the commission.

4. In view of the egregiousness of Judge Jenkins' offenses and the unlikelihood of his again exercising judicial power, it is unnecessary to consider permanently enjoining him from serving in judicial office. Rather, it is sufficient to remove him from office.

Justice MALLETT took no part in the decision of this case.

*Joseph F. Regnier, Phillip J. Thomas,* and *Thomas L. Prowse,* for the Judicial Tenure Commission of the State of Michigan.

*Leon Jenkins* in propria persona.

CAVANAGH, C.J.

### I. INTRODUCTION

This case arises from the Judicial Tenure Commission's filing of Formal Complaint No. 41 against respondent 36th District Judge Leon Jenkins. The complaint charged respondent with:

(1) engaging in routine solicitation and acceptance of bribes in return for the improper disposition of matters before him as a judge (principally traffic citations),

(2) engaging in routine improper ex parte communications with litigants and their representatives involved in matters before him as a judge,

(3) engaging in routine improper acceptance of, and failure to report, gifts, favors, loans, and other items of value from litigants and their representatives involved in matters before him as a judge,

(4) signing a writ of habeas corpus authorizing the release of a person respondent believed to be the friend of a close friend, without being fully informed of the facts and circumstances of the individual's incarceration, and following respondent's personal retention of another close friend as the incarcerated individual's attorney, who prepared the writ signed by respondent,

(5) intentionally misrepresenting his residential address on an automobile insurance application to the Farmers Insurance Company, in order to defraud Farmers, and

(6) soliciting an individual for whom respondent had agreed to fix certain traffic citations to commit perjury in connection with a federal investigation into respondent's activities.

In connection with the foregoing allegations, the complaint charged respondent with committing acts which would, if proven in a criminal trial, constitute violations of, inter alia, MCL 750.118; MSA 28.313 (acceptance of bribes by public official), MCL 750.218; MSA 28.415 (false pretenses with intent to defraud), MCL 750.425; MSA 28.667 (solicitation of perjury), and with violating the Code of Judicial Conduct, Canons 2A (impropriety and appearance of impropriety), 2C (permitting

friends or family to influence judicial conduct), 3A(4) (improper ex parte communications), 5C(4) (improper acceptance of gifts), and 6C (failure to properly report income).

We appointed a master in this case who, following a hearing, issued his report finding respondent guilty of the charged misconduct.[1] The commission adopted the master's findings of fact and conclusions of law, concluding that respondent had engaged in misconduct in office and conduct clearly prejudicial to the administration of justice within the meaning of Const 1963, art 6, § 30, and MCR 9.205(C). For reasons stated below, we adopt the findings of the master and the commission, and we hereby remove respondent from his judicial office.

## II. DISCUSSION

Respondent petitions this Court to reject the commission's recommendation, contesting the factual findings made below and raising a number of procedural challenges. We address these contentions in parts II(A) and (B). In part II(C), we discuss the commission's recommended action in this case.

### A. FACTUAL ISSUES

We review de novo the factual findings of the master and the commission. *In re Somers,* 384 Mich 320, 323; 182 NW2d 341 (1971). The standard of proof is preponderance of the evidence. *In re Loyd,* 424 Mich 514, 521-522; 384 NW2d 9 (1986).

---

[1] The master permitted amendment of the original complaint to include charges that respondent failed to respond timely to the original complaint, and that respondent harassed nine witnesses by filing defamation lawsuits against them. Neither the master nor the commission stated any findings or made any recommendations with regard to these charges, and we therefore do not address them.

On the basis of our de novo review of the record, we find overwhelming evidence that during the period from 1984 to 1987 respondent systematically and routinely sold his office and his public trust, committed acts which would, if proven in a criminal trial, constitute violations of three criminal statutes, committed wholesale violations of the most elementary canons of judicial conduct, and brought grave dishonor upon this state's judiciary.

The evidence of respondent's ticket-fixing activities includes the testimony of his former court clerk Cheryl Love, former court employee Rogers Armour, Jr., and fourteen individuals who received citations which were improperly dismissed by respondent.[2] Eight of the latter individuals testified that bribes or favors were given to middlemen or to respondent directly in return for respondent's dismissal of the citations. Six individuals testified to dealing directly with respondent as middlemen, passing bribes or favors to respondent in return for the improper dismissal of citations received by others.[3] The chief middleman was Sabah Dickow, a close friend of respondent who became a federal informant. In addition to Dickow's lengthy testimony against respondent, the evidence includes forty-three recorded conversations between respondent and Dickow and several other individuals.

It appears that respondent operated, to some extent, under the illusion that he could protect himself by attempting to avoid, on many occasions, any explicit quid pro quo for fixing a specific

[2] In most cases the citations themselves, stamped "Dismissed Judge Leon Jenkins," were admitted as evidence. In one case, where the citation itself could not be produced, a police officer testified regarding issuing the citation.

[3] Three of the middlemen also bribed respondent to dismiss citations of their own. These three are among the fourteen individuals noted above.

ticket.[4] The record is replete, however, with evidence that on numerous occasions respondent did indeed solicit and accept specific bribes in return for fixing specific tickets.[5] The fact that the ticket-fixing occurred on such a wholesale, systematic, and continuing basis that it was often unclear precisely which bribe applied to which ticket hardly mitigates the case against respondent. Respondent's conduct would, if proven in a criminal

[4] The following exchange between respondent and Dickow, recorded on August 16, 1985, is illustrative:

> *Dickow:* See judge, I like to, why I give you some like that, ticket, you have to tell me because I like to tell him, I wanna take my share, see? I can't tell him, you know, and I give you this, I can't.
> *Respondent:* You know, for you man, I'd do it for you free.
> *Dickow:* Judge.
> *Respondent:* The way you've been good to me, you just, every time I need something, you just.
> *Dickow:* No. You got it.
> *Respondent:* How 'bout that?
> *Dickow:* You got it.
> *Respondent:* I can do it free, and if I need somethin', I'll let you know.
> *Dickow:* Whatever you say. I'll take care of it.
> *Respondent:* There you go.
> *Dickow:* I take care of you.
> *Respondent:* I do it free, then if I need somethin', you take care of me.

[5] We can only express our incredulity at the often petty, but nevertheless pervasive, corruption presented by the record in this case. Aside from cash payments and unrepaid "loans," the favors sought or accepted by respondent included gasoline, jewelry, a .357 magnum handgun, an Uzi machine gun, and grocery items from Dickow's party store ranging from a bag of ice to a pound of ham.

The casual and routine character of the petty bribes solicited by respondent is illustrated by the testimony of attorney Jerrold Marsh. On August 30, 1985, Marsh was in respondent's court representing a client seeking a reduction in fines and costs previously imposed for certain fireworks violations. Without notifying the prosecutor's office, which was not represented, respondent granted the requested relief. Immediately afterward, while meeting in his chambers with Marsh, respondent said that he had left his wallet at home and asked Marsh to give him $30 or $40 for lunch. Marsh gave respondent $20 (all he had at the time), which respondent never repaid.

trial, constitute a violation of MCL 750.118; MSA 28.313, and indicates appalling disregard for Canons 3A(4), 5C(4), and 6C of the Code of Judicial Conduct.

The testimony of James Safiedine and insurance agent Thomas Pietila, and related documentary evidence, establishes that respondent, when applying for automobile insurance on December 23, 1985, intentionally misstated his residential address for the purpose of defrauding the Farmers Insurance Company. Respondent falsely gave Safiedine's West Bloomfield address as his own, when in fact respondent lived in Detroit. Respondent applied for policy renewals on the basis of this false address three times, on June 29, 1986, December 29, 1986, and June 29, 1987. The testimony of Farmers' policy supervisor Brenda Heninger establishes that respondent's misrepresentations defrauded Farmers of $2,015.45. This conduct may, if proven in a criminal trial, constitute a violation of MCL 750.218; MSA 28.415.

The testimony of Saud Barbat and Kevin Council establishes that in the summer of 1986 respondent accepted $200 in return for promising to dismiss several citations received by Council, but that Barbat and Council later learned that the citations had not been dismissed. Council's testimony indicates that the citations never were dismissed, and that respondent confronted Council with them in the spring of 1987. At that time, respondent asked Council, in return for future favors from respondent, to commit perjury by falsely testifying that no improper agreement to fix Council's citations had ever existed. This conduct would, if proven in a criminal trial, constitute a violation of MCL 750.425; MSA 28.667.

The testimony of Jerome Crawford and Sabah Dickow further establishes that on August 5, 1986,

respondent signed a writ of habeas corpus purporting to authorize the release of an individual, James Alexander Parrish, whom he believed to be a friend of Dickow. Parrish was in fact an undercover agent posing as an arrested felon. When Dickow informed respondent of Parrish's arrest and the charges against him, respondent agreed on the spot to effect his release, and told Dickow it would cost him $200 to $300. Respondent told Dickow he would personally retain an attorney for Parrish, and accepted a blank check drawn on Dickow's business account for that purpose. Respondent retained his close friend Jerome Crawford as Parrish's lawyer and gave Crawford the blank check, which Crawford filled out and cashed for $300. Respondent then signed the writ of habeas corpus prepared by Crawford. This conduct constituted, at the very least, a flagrant breach of Canons 2A and 2C of the Code of Judicial Conduct, in that it exhibited both the reality and the appearance that respondent, with extreme impropriety, permitted "his family, social, or other relationships to influence his judicial conduct or judgment."

In response to the foregoing evidence, respondent offers little beyond assertions of the allegedly unreliable character of the testimony against him. However, "[o]ur power of review de novo does not prevent us from according proper deference to the master's ability to observe the witnesses' demeanor and comment on their credibility." *Loyd,* 424 Mich 535. The master found the testimony against respondent credible and persuasive, and the commission found no reason to disagree. On the basis of our de novo review of the record, we also find no reason to question the master's conclusions.

Respondent, in his capacity as his own legal

counsel, argues his innocence on the basis of the record. We note, however, that in this judicial disciplinary proceeding we may properly take into account, as did the master, the fact that respondent declined to testify in his own behalf at the hearing below. See MCR 9.211(B); see also part II(B)(1). Arguments of counsel are not, of course, evidence. We therefore may, and indeed must, treat the extensive testimony against respondent as being unrebutted and unrefuted by respondent himself.[6] Furthermore, while respondent strongly disputes the *criminal* allegations against him, he conceded at oral argument before this Court that he has engaged in ex parte communications concerning matters pending before him as a judge.[7] When questioned regarding this practice, respondent made the startling assertion that he was unaware at the time that such communications are unethical under the Code of Judicial Conduct.

[6] We recognize that a transcript of respondent's testimony at his previous federal trial, at which he was tried and partially acquitted on certain criminal bribery charges, was admitted into evidence at the hearing below. In that prior testimony, responding to much of the same evidence that was offered against him at the hearing below, respondent did offer his version of events regarding the alleged ticket-fixing. While admissible as substantive evidence, however, see MRE 804(b)(1), such prior testimony cannot be accorded the same weight as live testimony, as the master properly noted in his report. While respondent's prior testimony was subject to cross-examination at the prior trial, the nature, purposes, and scope of the instant judicial disciplinary proceeding are different and much broader. For example, respondent's alleged ethical violations, a central issue in the instant proceeding, were not at issue in the prior trial. The examiner's inability to cross-examine respondent at the hearing below thus severely restricts the probative value of that prior testimony. The master's inability to observe respondent's demeanor while delivering the prior testimony further limits the weight which can be accorded to that testimony.

In any event, on the basis of our de novo review of respondent's prior testimony, we conclude that it fails to rebut in any substantial respect the overwhelming evidence against respondent.

[7] We also find, as did the commission, that respondent's prior testimony at his federal trial, see n 6, includes numerous admissions of blatantly unethical ex parte communications and acceptance of gifts.

Respondent's self-professed ignorance of a rule which all judges in this state are obligated to understand bolsters still further our conclusion that he has exhibited a fundamental disregard for the Code of Judicial Conduct.

We adopt the factual findings of the master and the commission.[8]

### B. PROCEDURAL ISSUES

Respondent raises eight separate procedural challenges to the proceedings below. Most of these contentions are frivolous and merit no further discussion.[9] We address below respondent's claims that his rights under the Fifth Amendment and Michigan's exclusionary rule were violated.

[8] We reject respondent's contention that the master and the commission somehow failed properly to consider all relevant circumstances of respondent's conduct, including personal tragedies suffered by respondent and "coercion" allegedly exerted upon him by Sabah Dickow. We find nothing in the record which even suggests that respondent's misconduct was anything but fully voluntary. Respondent, who was presumably in the best position to offer evidence to the contrary, declined to testify, as we have noted. As to respondent's recitation of personal tragedies, including several deaths in his family, we note simply that personal sympathy for respondent cannot and does not excuse his judicial misconduct.

[9] These include respondent's claims that

(1) the master improperly admitted written transcripts of the 43 recorded conversations without sufficient evidence of their authenticity,

(2) the instant proceeding violates respondent's double jeopardy rights in view of his prior trial and acquittal on certain criminal bribery charges, see *In re Probert,* 411 Mich 210, 226, n 7; 308 NW2d 773 (1981),

(3) the refusal to stay the instant proceeding pending completion of all criminal proceedings against respondent denied him the equal protection of the laws,

(4) the master improperly failed to consider respondent's prior testimony at his federal criminal trial as substantive evidence, see n 6,

(5) the master improperly admitted certain evidence under the hearsay exception of MRE 804(b)(3), and

(6) respondent's due process rights were violated by the master's miscitation of certain statutes in his report.

### 1. *SELF-INCRIMINATION*

Respondent contends that the master violated his Fifth Amendment right not to incriminate himself by holding, in accordance with MCR 9.211(B), that his failure to testify in his own behalf could be considered as an evidentiary fact.[10] MCR 9.211(B) also provides that "[t]he respondent's failure to answer or to appear at the hearing may not, *standing alone,* be taken as evidence of the truth of the facts alleged to constitute grounds for commission action." (Emphasis added.) Because it is clear that the master acted in accordance with MCR 9.211(B), respondent's contention amounts to a facial challenge to the rule itself.

Respondent's reliance on *Garrity v New Jersey,* 385 US 493; 87 S Ct 616; 17 L Ed 2d 562 (1967), is misplaced. *Garrity* involved an appeal from a criminal conviction and held merely that the privilege against self-incrimination "prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office . . . ." *Id.* at 500. In *Garrity,* the statements the prosecution sought to introduce had been obtained when the public-employee defendant was required, on pain of dismissal, to answer job-related questions during an internal investigation. Even assuming arguendo that a judge facing disciplinary proceedings enjoys the same rights as an ordinary public employee, the United States Supreme Court has held that the privilege against self-incrimination does not prohibit dismissal of a public employee who has

---

[10] Respondent also contends that the master violated his right not to incriminate himself by taking into account his failure to respond timely to the original complaint against him. Because neither the master nor the commission stated any findings on that issue, see n 1, we need not reach respondent's claim on that point. For reasons discussed in the text below, the claim appears meritless in any event.

refused to answer questions specifically, directly, and narrowly relating to the performance of his official duties, without being required to waive his immunity with respect to the use of his answers or the fruits thereof in a criminal prosecution of himself . . . . [*Gardner v Broderick,* 392 US 273, 278; 88 S Ct 1913; 20 L Ed 2d 1082 (1968).]

"Constitutionally, the employee may . . . be fired either on the basis of his answers or for refusing to answer." *D'Acquisto v Washington,* 640 F Supp 594, 622-623 (ND Ill, 1986); see also *Buckner v Highland Park,* 901 F2d 491, 496 (CA 6, 1990).

Under *Garrity* and its progeny, the Fifth Amendment issue only arises when statements made under the lash of a disciplinary proceeding might be used in a subsequent criminal proceeding. The issue then becomes whether such statements may be so used or whether immunity must be afforded with regard to them. See *Lefkowitz v Turley,* 414 US 70, 84; 94 S Ct 316; 38 L Ed 2d 274 (1973) ("given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment"). Respondent in this case was never asked or required to waive his privilege against self-incrimination at any subsequent criminal proceeding. If he had chosen to testify at the hearing below, he would have remained free, at any subsequent criminal proceeding, to interpose a Fifth Amendment immunity claim against use of his hearing testimony.[11] But in

[11] We do not express any view with regard to whether such a hypothetical claim would have succeeded. There are cases suggesting that where, as under MCR 9.211(B), a failure to testify is not, "standing alone," grounds for adverse action, but rather may only be "considered as an evidentiary fact," any statements made *would* be fully admissible in a later criminal proceeding. See, e.g., *Diebold v St Louis Civil Service Comm,* 611 F2d 697, 701 (CA 8, 1979). Furthermore, we doubt whether the threatened sanction in a judicial discipli-

this case, as it happened, respondent chose not to testify. Thus, the issue whether any statements he *might* have made *would* have been admissible at some future criminal proceeding will never arise. This is not a criminal proceeding, and evidentiary consideration of respondent's failure to testify is fully in accord with *Garrity* and the Fifth Amendment.

### 2. ADMISSIBILITY OF RECORDED CONVERSATIONS

Respondent contends that the master erred by not suppressing the surreptitiously recorded conversations between respondent and Dickow, which were obtained with Dickow's consent but without any warrant or finding of probable cause. Such "participant recordings" are not "searches or seizures" for purposes of the Fourth Amendment and are not covered by the federal exclusionary rule. See *United States v White,* 401 US 745; 91 S Ct 1122; 28 L Ed 2d 453 (1971). Respondent correctly notes, however, that these recordings would be inadmissible in a state criminal proceeding under Michigan's exclusionary rule as set forth in currently prevailing case law.[12] See *People v Beavers,* 393 Mich 554, 567-568; 227 NW2d 511 (1975); *People v Atkins,* 96 Mich App 672, 680; 293 NW2d

nary proceeding—loss of the privilege of holding judicial office—is constitutionally comparable to the threatened loss of employment on the part of an ordinary public employee. Because these issues do not arise in this case, however, we do not decide them.

[12] Respondent's preliminary contention that these recordings were obtained in violation of MCL 750.539c; MSA 28.807(3), is devoid of merit. The federal agents who obtained the recordings in this case were acting within the scope of their authority under federal law, and federal and state law enforcement officials otherwise acting within their lawful authority are exempt from that statute. See MCL 750.539g(a); MSA 28.807(7)(a). The federal agents' lawfully authorized conduct would be immune from direct state sanction in any event, under the Supremacy Clause, US Const, art VI, cl 2. See *In re Neagle,* 135 US 1; 10 S Ct 658; 34 L Ed 55 (1890).

671 (1980).[13] Furthermore, while the federal exclusionary rule has generally not been applied outside the criminal context, see, e.g., *INS v Lopez-Mendoza,* 468 US 1032; 104 S Ct 3479; 82 L Ed 2d 778 (1984); *United States v Janis,* 428 US 433; 96 S Ct 3021; 49 L Ed 2d 1046 (1976), Michigan's exclusionary rule has in certain cases been applied to civil proceedings, see *Lebel v Swincicki,* 354 Mich 427, 437-438, 440; 93 NW2d 281 (1958); *Gilbert v Leach,* 62 Mich App 722, 725; 233 NW2d 840 (1975), aff'd sub nom *McNitt v Citco Drilling Co,* 397 Mich 384; 245 NW2d 18 (1976).

Judicial disciplinary proceedings, however, are fundamentally distinct from all other legal proceedings, whether civil or criminal. See *In re Mikesell,* 396 Mich 517, 528-529; 243 NW2d 86 (1976); see also *In re Cieminski,* 270 NW2d 321, 326 (ND, 1978); *McComb v Comm on Judicial Performance,* 19 Cal 3d Spec Trib Supp 1, 10, n 5; 138 Cal Rptr 459; 564 P2d 1 (1977).[14] The purpose of these proceedings is not to impose punishment on the respondent judge, or to exact any civil recovery, but to protect the people from corruption and abuse on the part of those who wield judicial power. See *Mikesell,* 396 Mich 528-529.

While the unique character and purpose of judicial disciplinary proceedings might incline us not to apply the exclusionary rule in this context, we need not reach that conclusion in this case. The record contains more than ample evidence, apart from the recorded conversations, to support the

[13] We do not revisit in this case the exclusionary rule issue addressed in *Beavers* and *Atkins.* We note that we have granted leave and heard oral argument in another case which may require us to revisit that issue. See *People v Collins,* 434 Mich 900 (1990). [N.B.: *Beavers* overruled, *People v Collins,* 438 Mich 8, 40; 475 NW2d 684 (1991)—REPORTER.]

[14] While such proceedings resemble civil proceedings in many respects, see MCR 9.211(A), they also partake of an administrative character, see *Mikesell,* 396 Mich 528. It is well established that they are not in any sense criminal proceedings. See *id.* at 528-529.

findings of the master and the commission. Further, MCR 9.203(D) provides:

> Errors and Irregularities. An investigation or proceedings under this chapter may not be held invalid by reason of a nonprejudicial irregularity or for an error not resulting in a miscarriage of justice.

Even if the recorded conversations were erroneously admitted, we find no such miscarriage.

### C. RECOMMENDED ACTION

The commission recommends that we remove respondent from office and permanently enjoin him from ever again serving in any judicial office in the State of Michigan. We have held that a permanent injunction against *"holding"* judicial office does not fall within the scope of our power under either § 4 or § 30 of art 6 of the Michigan Constitution, see *In re Probert,* 411 Mich 210, 229-233; 308 NW2d 773 (1981), while leaving open the possibility that the former provision might empower us to permanently enjoin a judge from *"serving in"* any judicial office in the future, see *In re Callanan,* 419 Mich 376, 387-389; 355 NW2d 69 (1984). We have been reluctant, however, to exercise the latter power. See *Loyd,* 424 Mich 536; *Callanan,* 419 Mich 389.

We find it sufficient in this case to remove respondent from office. As we noted in *Callanan,* "in view of the egregiousness" of respondent's offenses, "we are not so cynical about the electoral or appointive process that we are concerned about the respondent's re-entry upon the judicial scene." 419 Mich 389. We note in any event that we always retain "the power to determine that a person is unfit for judicial office and to prevent

him from ever exercising judicial power in this state for as long as he is, in our judgment, judicially unfit." *Probert,* 411 Mich 231.

### III. CONCLUSION

We hereby order respondent removed from office. Pursuant to MCR 7.317(C)(3), the clerk is directed to issue the order forthwith.

LEVIN, BRICKLEY, BOYLE, RILEY, and GRIFFIN, JJ., concurred with CAVANAGH, C.J.

MALLETT, J., took no part in the decision of this case.