## *In re* FERRARA

Docket No. 109593. Argued May 6, 1998 (Calendar No. 11). Decided
July 28, 1998. Rehearing denied 459 Mich 1205.

The Judicial Tenure Commission filed a formal complaint with the
Supreme Court against Andrea J. Ferrara, Judge of the Third Judi-
cial Circuit Court, alleging several instances of judicial misconduct.
Judge Ferrara was temporarily suspended pending final disciplinary
determination. Judge Vesta Svenson was appointed master to pre-
side over the hearing of the complaint. During the course of the
hearing, amended complaints were filed, alleging obstruction of
justice, additional charges of conduct clearly prejudicial to the
administration of justice, fabrication of evidence, obstruction of
justice, dishonesty, and fraud. Following the hearing, the master
found Judge Ferrara guilty of the charged misconduct. Thereafter
the Judicial Tenure Commission recommended that Judge Ferrara
be removed from the bench. The respondent appeals.

In an opinion by Justice WEAVER, joined by Chief Justice MALLETT,
and Justices BRICKLEY, BOYLE, and TAYLOR, the Supreme Court *held*:

The recommendation of the Judicial Tenure Commission that
Judge Andrea J. Ferrara be removed from judicial office is
accepted.

The respondent displayed a disregard for the truth, as well as a
lack of candor with the tribunal. Her conduct throughout the for-
mal hearing was inappropriate, unprofessional, and demonstrated a
lack of respect for the judicial discipline proceedings. Her evidence
and testimony were replete with half-truths and misleading state-
ments, and her testimony was so unnecessarily vague as to hinder
the proceedings and significantly interfere with the administration
of justice. Her unsupportable denials and inconsistent statements
to the media, the public, the commission, and the Supreme Court
stand as clear evidence of her inability to be forthright, to avoid
appearances of impropriety, and to fulfill the ethical obligations of
a judicial officer, who must be perceived to be a person of absolute
integrity. Her statements have clearly prejudiced the administration
of justice and evidence a fundamental lack of respect for the truth-
seeking process. Further, the respondent attempted to fabricate
evidence, obstruct justice, and perpetuate a fraud upon the

Supreme Court, antithetical to the role of a judge who is sworn to uphold the law and seek the truth. Her actions constitute misconduct in violation of Canons 1, 2A, and 2B of the Canons of Judicial Conduct and MCR 9.205(C)(4).

Justice CAVANAGH, joined by Justice KELLY, concurring, stated that the respondent should be removed from office because of her actions regarding the Avela Smith letter. She undertook a substantial amount of effort to present the letter to the master and to see that it was offered as something other than what it truly was. Her conduct violated MCR 9.205(C)(4), conduct clearly prejudicial to the administration of justice, and Canon 2 of the Code of Judicial Conduct, an appearance of, and actual, impropriety, and indicated a failure to respect and observe the law and promote public confidence in the judiciary.

Respondent is removed from judicial office.

*Allan D. Sobel,* Examiner, and *Anna Marie Noeske,* Associate Examiner, for the Judicial Tenure Commission of the State of Michigan.

*Constance E. Cumbey* and *Bendure & Thomas* (by *Mark R. Bendure*) for the respondent.

WEAVER, J. Judge Andrea J. Ferrara, respondent, has served as judge in the Third Judicial Circuit Court in Wayne County since January 1993.[1] On February 9, 1998, the Judicial Tenure Commission recommended that she be removed from office for the remainder of her term. We review this matter pursuant to Const 1963, art 6, § 30,[2] and accept the recommendation

---

[1] Respondent's current term expires in 2001. Before her service as a Third Circuit judge in Wayne County, respondent served as a 33rd District Court judge from January 1981 through 1986. She was not reelected to this post, but did serve as a judge by appointment in the 36th and 19th District Courts in Wayne County.

[2] Article 6, § 30 provides in relevant part:

On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, mis-

that respondent should be removed from office
because her conduct "before and during the hearing,
independently warrants the most severe sanction."[3]

Respondent's behavior from the time the newspaper medium made public the contents of the tapes
containing racial and ethnic slurs made by the
respondent, through the judicial misconduct hearing,
and up to respondent's statements to this Court at her
appeal hearing, reveal that respondent has neither the
temperament, judgment, nor character to be a member of the judiciary. Our decision is not based on the
actions that led to the initial charges of misconduct,
the racial and ethnic slurs made by respondent in private telephone conversations with her ex-husband on
eleven occasions between 1992 and 1993. Instead, our
finding of misconduct meriting removal is premised
upon respondent's conduct after the derogatory statements were made public by the press and other
media. Thus, it is not necessary to adopt the commission's finding regarding these statements or to determine whether the tapes were properly admitted in
light of the federal Wiretapping Act, 18 USC 2515.[4]

---

conduct in office, persistent failure to perform his duties, habitual
intemperance or conduct that is clearly prejudicial to the administration of justice.

[3] We adopt the commission's recommendation for removal from office,
"in view of the egregiousness" of respondent's conduct, and must note
that, in so doing, "we are not so cynical about the electoral or appointive
process that we are concerned about the respondent's re-entry upon the
judicial scene." *In re Callanan,* 419 Mich 376, 389; 355 NW2d 69 (1984).
See also *In re Leon Jenkins,* 437 Mich 15, 29-30; 465 NW2d 317 (1991).

Furthermore, it should be clear that, should respondent decide to seek
election to judicial office, respondent cannot be characterized as an
incumbent because she has been removed, not merely suspended, from
office.

[4] Similar reasoning was employed by this Court in *In re Leon Jenkins,*
n 3 *supra* at 28-29, where we stated:

Although we do not base our judgment on the statements, and therefore do not reach the respondent's defenses regarding them, we unequivocally state our view that whatever respondent's right to her own private opinion, a person harboring and communicating such revolting views is unworthy of holding the privileges and responsibilities of public office. Indeed, the mean-spirited, crude, and biased nature and tone of the statements that were made public are inexcusable and unacceptable from a judge. See, e.g., *In re Bennett*, 403 Mich 178, 199; 267 NW2d 914 (1978).

### I. FACTS

This proceeding against respondent, Third Circuit Judge Andrea J. Ferrara of Wayne Circuit Court, stems from the highly inflammatory contents of eleven recordings,[5] which were made public on Feb-

---

While the unique character and purpose of judicial disciplinary proceedings might incline us not to apply the exclusionary rule in this context, we need not reach that conclusion in this case. The record contains more than ample evidence, apart from the recorded conversations, to support the findings of the master and the commission.

In that case, we held that, even if the recordings were erroneously admitted, we find no miscarriage of justice, given the strength of the independent grounds for discipline. Therefore, according to MCR 9.203(D), the investigation or disciplinary proceedings could not be later found invalid. *Id.* at 29.

[5] The original recordings were made by respondent's ex-husband, Howard Tarjeft, from whom respondent was divorced in 1985. The excerpts printed in the press were from a tape containing damaging excerpts of conversations between the ex-spouses that Tarjeft recorded in 1992 and 1993, while respondent was running for office and after she was elected. He turned the tapes over to the newspaper as part of an ongoing and very hostile battle between the ex-spouses over custody of their minor twin sons.

The separation agreement awarded joint custody of the boys to respondent, sole personal custodian, and Tarjeft was ordered to pay the mini-

ruary 19, 1997, by a Detroit newspaper article entitled, "Recordings indicate judge slurred Jews, blacks and others." The article reported that in seven of those conversations Ferrara, who is white, used the word "nigger" or variations, and also made other racial and ethnic slurs. The article read in part:

> She used the word to criticize a black circuit court judge, question the loyalty of a black political supporter and complain about a coworker at the U.S. Immigration and Naturalization Service, where Ferrara worked as a trial attorney from 1988 to 1992.
>
> Ferrara also used the word to express concern about people who might show up if she had a garage sale or those her children might encounter if Tarjeft took them shopping at a mall or camping at a Detroit-area park.
>
> She also used the derogatory remark to express concern that her ex-husband's car might break down with the children in it in a predominantly black neighborhood.
>
> "Well all you need is a breakdown in niggertown," Ferrara said.
>
> In another conversation, Ferrara called her husband a vicious person with a sick mind.
>
> "You're probably part black," Ferrara said. "You are, I think you are. I think you've got nigger blood in you."
>
> "Maybe I do," Tarjeft said. "Maybe there's some Sicilian blood in the background, who knows."
>
> "I know there is and that's nigger." Ferrara said. "So, that's why you're as sick as you are."
>
> Ferrara called a circuit court judge with whom she was unhappy a "little whore Jew."

---

mum allowance in child support. That order was never modified. However, respondent and Tarjeft initiated numerous legal battles over the years as a result of their ongoing custody disputes. Respondent is currently seeking payment of allegedly significant arrearages and has alleged, inter alia, that Tarjeft is guilty of kidnapping and filing frivolous complaints with social services alleging abuse and neglect. Tarjeft has filed various civil, professional, and criminal claims against respondent as well.

> She also said she was depressed that an Arab family had
> moved nearby and said she didn't want to live across the
> street from "a bunch of you-know-whats." She said, "They
> sit there and sit on the porch gaggling . . . ."

These statements were recorded in 1992 and 1993 by respondent's ex-husband, Tarjeft, who made the recordings in an apparent attempt to gain ammunition for his very hostile custody battle with respondent over their twin minor sons. Respondent claims that in September 1996, to avoid an arrearage hearing, Tarjeft extorted respondent by threatening to destroy her career by releasing the tapes should she not capitulate to his demands regarding the arrearages, custody arrangement, and a fee dispute with another attorney. Tarjeft told the press that he made the tapes to level the playing ground between the ex-spouses. He apparently felt he was at a constant disadvantage to respondent in legal proceedings given her position as a judge.

After the publication of the statements made by respondent, the Judicial Tenure Commission initiated an investigation into the matter.[6]

The investigation led to the filing of Formal Complaint No. 52 by the commission's examiner, who charged respondent with several instances of judicial misconduct for communicating racist and other ethnically discriminatory views, bias, or the appearance of bias against these racial and ethnic groups. The exam-

---

[6] It is undisputed that respondent never filed a formal, written response to the commission's letter of inquiry, commonly referred to as a "28-day letter." Respondent maintains that, in essence, her failure to respond was due to a failure to communicate with her attorney, and that she was under a great deal of stress and in a state of general confusion after the release of the tapes.

iner also charged respondent with publicly misrepresenting those communications during a February 1997 press conference that respondent herself convened.[7]

In May 1997, this Court temporarily suspended respondent pending the final disciplinary determination.

On June 11, 1997, we appointed the Honorable Vesta Svenson as master to preside over the hearing of the complaint against respondent. During the course of the hearing, a second amended complaint was filed in early October 1997 to conform to the proofs pursuant to MCR 9.124, and to include charges of obstruction of justice from the October 3, 1997, proceedings. These additional charges were based on (1) testimony by respondent's minor twin son, Christopher Tarjeft, that respondent asked him to destroy the tapes, and (2) respondent's refusal to answer further questions regarding the tapes on the basis of alleged privacy rights under the federal wiretapping statute.

A third amended complaint was filed on October 29, 1997, and included additional charges of conduct clearly prejudicial to the administration of justice, fabrication of evidence, obstruction of justice, dishonesty, and fraud. These charges were based on respondent's attempts to introduce a letter purportedly written by Avela Smith, a concerned citizen who became acquainted with respondent several years before the release of the tapes and the surrounding negative publicity.

---

[7] This original complaint was amended to include, in paragraph 13, an allegation that respondent also made racist statements to her sons and two other individuals while she was a circuit court judge. Subparagraphs 13(a) and (b) were subsequently dismissed by the examiner.

In her defense, respondent presented twenty-two witnesses, including herself. Many of the witnesses were African-Americans or of Arab descent, and were therefore members of some of the groups of which respondent spoke in the tapes. These witnesses all testified that they saw no discriminatory conduct nor heard any use of discriminatory language by respondent in the years they had known her. Several witnesses also indicated that, even if they did believe respondent made the statements in the tapes, they would not change their view of her as a fair and nonracist person.

On January 5, 1998, after nine days of hearings and after written closing arguments, the master filed a twenty-two page report that culminated in a finding that respondent was indeed guilty of the charged misconduct. Both parties filed written objections, and on February 9, 1998, following oral argument, the commission adopted the master's findings of fact and conclusions of law, including all but the following evidentiary rulings:

> 1. The Master found that there was no unambiguous evidence to suggest that Respondent ever displayed racial prejudice or ethnic bias while on the bench.
>
> While the Commission agrees with the Master's comments, the Commission notes that Formal Complaint No. 52, as amended, does not charge Respondent with misconduct on the bench and therefore that issue was never litigated.
>
> 2. The tape recordings of Respondent's comments were requested by the Commission after they became publicly disclosed by the media. The Commission ultimately subpoenaed the original tapes for prehearing testing by both parties and for the introduction of evidence at the hearing.

3. The Master misstated, on page 21 of her report, that Respondent violated MCR 9.105(A) and MCR 9.105(C)(4), apparently instead of MCR 9.205(A) and MCR 9.205(C)(4). The Commission finds, in any event, that Respondent did violate MCR 9.205(A) and MCR 9.205(C)(4).

4. The Commission agrees with the Master's conclusion, on pages 7-8 of her report, that Respondent's voice and words are heard on the tape recordings. The Commission further notes that at the hearing before the Commission which took place on February 9, 1998, Respondent's counsel admitted that Respondent had made the tape recorded statements at issue in this case.

The commission found that respondent engaged in misconduct within the meaning of Const 1963, art 6, § 30, as amended, and MCR 9.205.

By her racist remarks and racial and ethnic slurs, her public misrepresentations, her conduct at the hearing, her fabrication and misrepresentation of evidence, Judge Ferrara has violated standards of professional and judicial propriety governing her behavior. Aside from the bigoted comments, Judge Ferrara's conduct, before and during the hearing, independently warrants the most severe sanction. By her conduct Judge Ferrara has seriously eroded the public confidence in the judiciary of this state.

In light of the serious nature of Judge Ferrara's conduct and its negative impact on the administration of justice and the judicial system, as well as violations of the Michigan Code of Judicial Conduct, this Commission finds that Judge Ferrara should be removed from judicial office.

II

Under Const 1963, art 6, § 30 and MCR 9.223-9.225, we are charged with reviewing this matter. Our de novo review[8] of the extensive record convinces us

---

[8] *In re Somers*, 384 Mich 320; 182 NW2d 341 (1971).

that the master effectively insured that the hearing was conducted in a fair and proper manner, and that it conformed as nearly as possible to the rules of procedure and evidence governing trial of civil actions in circuit court. MCR 9.211(A).

Respondent cites approximately forty-seven specific objections to the master's report. We find it unnecessary to address the objections regarding admission of the tapes into evidence because our conclusion is based solely on the other grounds of misconduct. As to the remaining issues, we find respondent's arguments without merit and decline to address them except where necessary to the discussion of grounds that support our finding of misconduct.[9]

### III. GROUNDS FOR MISCONDUCT

There are two sources that establish the standards of judicial conduct. MCR 9.205 sets forth the grounds for a finding of judicial "misconduct" and the possible forms of discipline that can be imposed for misconduct. In relevant part, MCR 9.205(C) provides:

Misconduct. A judge is guilty of misconduct in office if:

(1) the judge is convicted in the United States of conduct which is punishable as a felony under the laws of Michigan or federal law;

(2) the judge persistently fails to perform judicial duties;

(3) the judge is habitually intemperate within the meaning of Const 1963, art 6, § 30;

(4) the judge's conduct is clearly prejudicial to the administration of justice . . . .

---

[9] Furthermore, we do not base our decision on Christopher Tarjeft's testimony, given its obvious inconsistencies and indicia of bias in favor of the boy's father, Tarjeft.

The other source governing judicial conduct is the Code of Judicial Conduct. In relevant part, those canons provide:

> Canon 1 A judge should uphold the integrity and independence of the judiciary. . . .
>
> Canon 2 A judge should avoid impropriety and the appearance of impropriety in all activities.
>
> A. Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. A judge must expect to be the subject of constant public scrutiny. A judge must therefore accept restrictions on conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.
>
> B. A judge should respect and observe the law. At all times, the conduct and manner of a judge should promote public confidence in the integrity and impartiality of the judiciary. Without regard to a person's race, gender, or other protected personal characteristic, a judge should treat every person fairly, with courtesy and respect.

A finding of misconduct under the court rules and judicial canons must be based on a preponderance of the evidence. *In re Leon Jenkins*, 437 Mich 15, 18; 465 NW2d 317 (1991); *In re Loyd*, 424 Mich 514, 522; 384 NW2d 9 (1986).

As previously stated, the commission adopted the master's finding and recommended that respondent be removed from the bench because of the following acts of misconduct: "her racist remarks and ethnic slurs," as well as "her public misrepresentations, her conduct at the hearing, her fabrication and misrepresentation of evidence." At this stage of the judicial discipline proceedings, we must consider whether to adopt the commission's recommendation.

The commission found that respondent committed misconduct by publicly misrepresenting that the tapes were "fake" at her press conference, attempting to introduce a fraudulent letter into evidence and thereby perpetrating a fraud on the court, and engaging in conduct throughout the proceedings that was "inappropriate, unprofessional, and demonstrated a lack of respect" for those proceedings.

### A. STATEMENTS TO THE PRESS AND THE PUBLIC

The commission adopted the master's findings of fact to support the charge of misconduct on the basis of respondent publicly misrepresenting that the tapes were " 'fake' when she knew she had made the statements and had, in fact, premised a $100,000,000 lawsuit on the fact that she had been tape recorded while making the statements . . . ."

On February 19, 1997, respondent called a televised news conference and stated: "The tapes are a fake. I have listened to the tapes and that is not my voice contained on those tapes." While she told this Court that she did in fact listen to the tapes before this conference, her testimony to the master, though often conflicting and evasive, indicated she only listened to some of the taped conversations in her attorney's office before this press conference. Because she did not listen to the tapes in their entirety or have them examined, she could not honestly and conclusively state that her voice was not on the tapes and that they were fakes. More importantly, respondent later clarified that she did, in fact, recognize her voice on some portions of the tape.

While simultaneously denying that her voice was on the tapes, respondent filed a federal suit against the

paper that originally published the taped statements, the reporter who authored the article, and Tarjeft.[10] Paragraph 11 of that verified complaint, signed by respondent, stated unequivocally that the taped conversations did, in fact, contain respondent's voice.

This Court recognized in *In re Tschirhart*, 422 Mich 1207, 1209-1210 (1985), that

"[t]he proper administration of justice requires that the Commission view the Respondent's actions in an objective light. The focus is necessarily on the impact his statements might reasonably have upon knowledgeable observers. Although the Respondent's subjective intent as to the meaning of his comments, his newly exhibited remorsefulness and belated contrition all properly receive consideration, any such individual interests are here necessarily outweighed by the need to protect the public's perception of the integrity of the judiciary."

In this case, respondent has reduced the number of considerations because she never exhibited true remorsefulness for her misleading comments to the public and has never shown that she understands the damage to the judiciary that occurs when a judge offers, as fact, public statements that are not reasonably supported, researched, investigated, or believed to be true.

Respondent displayed a similar disregard for the truth, as well as a lack of candor with the tribunal, when she answered questions before the master and this Court regarding whether she uttered the ugly words disseminated to the public by, and attributed

---

[10] The suit was filed on March 20, 1997. Case No. 97-71136. The paper and the reporter subsequently were dismissed from the suit on May 6, 1998; however, the action against Tarjeft is ongoing.

to her in, the press. In fact, the only time respondent has ever accepted responsibility for uttering the taped statements was not by her own accord, but by an admission of her counsel during oral argument before the commission regarding the master's recommendations on February 9, 1998. However, when respondent appeared before this Court to appeal the commission's recommendation, she refused to directly answer questions regarding whether her voice uttered the racist statements on the tapes. She told this Court that the "taped conversations were in the nature of personal and private disputes with my ex-husband before I became a circuit court judge."[11] Respondent then made the following nonsensical statement that would indicate a total failure by respondent to accept what every judge must be able to recognize, the overwhelming weight of the evidence, which in this case indicates that she did make such statements.[12] Respondent stated:

> I deeply regret having said any of the comments attributed to me on the tapes. I never intended to offend.[13]

---

[11] This assertion is not true, because some of the taped conversations occurred after January 1, 1993, when respondent assumed the Third Circuit bench. Respondent seemed to understand this point, as she admitted it in her brief to this Court.

We not only question the accuracy, but also the relevancy of this assertion. MCR 9.205(E) clearly states that conduct that occurred "before or after the respondent became a judge" may be the subject of disciplinary proceedings and may, therefore, constitute "misconduct in office."

[12] The tapes were authenticated and declared unaltered by two experts, one of the commission's choosing and the other of respondent's. Further, the master and the commission found the voice on the tapes to be hers, as did several of the witnesses who testified in respondent's case in chief.

[13] When pressed regarding the meaning of this curious statement, respondent engaged in the following exchange:

> *Justice BOYLE*: I beg your pardon, attributed to you?

In refusing to accept responsibility for her comments, respondent ultimately deprived herself of the opportunity to truly and sincerely apologize for her conduct. Her unsupportable denials and inconsistent statements to the media, the public, the commission, and this Court stand as clear evidence of her inability to be forthright, to avoid appearances of impropriety, and to fulfill the ethical obligations of a judicial officer, who must be

"perceived to be a person of absolute integrity. When a judge's character and morals come into question not only do the people lose respect for him as a person, but worse, respect for the Court over which he presides is lost as well." [422 Mich 1211.]

Her statements to the press and the public, as well as to the master and this Court, have clearly prejudiced the administration of justice, evidence a fundamental lack of respect for the truth-seeking process, and, furthermore, if left unrebuked, threaten to

---

*Judge Ferrara:* Yes, attributed to me on the tape. Yes.

*Justice BOYLE:* Attributed to you?

*Judge Ferrara:* May I finish my statement or not?

*Justice WEAVER:* Did you say them or not? That's what [the] Justice . . . wants to know . . . .

*Judge Ferrara:* Did I say those things? I have no recollection of saying those things and there's been a finding that I said those things, and I deeply regret having said those comments. I can't deny that that sounds like my voice on that tape. I honestly do not remember saying those things. Those comments and statements are totally out of character. . . . And I can attest that nobody, nobody has ever heard me talk like that ever.

*Justice WEAVER:* . . . Do you admit that you said it on the tape or not. It's simple. Either yes or no.

*Judge Ferrara:* If I said those words, they were spoken in the heat of the moment and do not reflect my attitudes or beliefs.

*Justice WEAVER:* Still "*if.*" [Emphasis added.]

severely compromise the public's confidence in the judiciary's integrity. Accordingly, we find respondent's actions to constitute misconduct in violation of Canons 1, 2A, 2B, and MCR 9.205(C)(4).

B. ATTEMPT TO INTRODUCE A FRAUDULENT LETTER—TWICE

The commission further found that respondent attempted to fabricate evidence, obstruct justice, and "perpetrate a fraud upon the court in the form of a fabricated letter she attempted to introduce through her witness, Avela Smith . . . ."[14] Specifically, the commission alleged that respondent had attempted to

---

[14] The examiner's second and third amended complaints alleged that respondent obstructed justice on three separate occasions. We only address the allegation contained in the examiner's third amended complaint regarding a letter that respondent attempted to introduce through witness Avela Smith. The letter is as follows:

JUDGE FERRARA IS NO RACIST

It is said that actions speak louder than words. Avelia [sic] Smith, a Detroit resident says she's fed up with the one-sided bias reporting of Judge Ferrara by the Detroit Free Press. "Judge Ferrara is no racist" says Avelia Smith. "I know her to be a decent and kind person." Ms. Smith reports that in August 1994 she attended a political rally at Belle Isle and was stranded with no way home. She had asked several people for help and was turned down. Ready to give up all hope, she approached a woman who she did not know. The woman readily agreed to give her a ride and drove her home to VanDyke & Mack area. This good deed was not forgotten. In March 1997, Avelia was watching the evening news and immediately recognized the woman who extended an act of kindness to her 3 years ago. It was Judge Andrea J. Ferrara.

Avelia Smith tried to reach Judge Ferrara at her office to lend support. However Judge Ferrara could not be reached due to a medical leave. Ms. Smith did not give up. She kept calling and finally was able to make contact with Judge Ferrara.

Ms. Smith wants the Detroit community to know the kinder, gentler side of Judge Ferrara. "Giving a black woman stranger a ride home from Belle Isle does not reflect racism," says Smith.

It is important to note that despite repeated attempts to contact the Detroit Free Press no one has bothered to return my calls. Apparently they only want to print what supports their agenda.

mislead the court, or at least create a false impression, with respect to the time, motivation, and scrivener of the letter.

Respondent's first witness was Avela Smith, an African-American woman, whom she first encountered at, and subsequently drove home from, a 1994 political rally on Belle Isle in Detroit. Ms. Smith testified that she had no subsequent contact with respondent until 1997, after the statements were published. After hearing the negative press and charges of racist behavior leveled against respondent, Ms. Smith offered to testify on respondent's behalf.

Days before testifying, and well after the hearings began, Ms. Smith and respondent met at a Detroit-area McDonalds restaurant to draft a letter purportedly meant to be sent to the "Michigan Chronicle." At no point before moving for admission of the letter was the recent date of the letter or the identity of the scrivener elicited. It was only after respondent's counsel moved to admit the letter that, on voir dire, the examiner uncovered the critical facts regarding the timing of the letter and identified the scrivener as the respondent.[15] Furthermore, the examiner revealed, on

---

Many of my friends in the Detroit community believe this is a subterfuge to divert attention away from the real racism which is the abolition of Detroit Recorders Court by the Engler Administration.

> Avela Smith
> # 313 5211315
> 11413 Kenmoor
> Det Mich
> 48205

[Name and address in cursive penmanship; body of letter printed.]

[15] Ms. Smith's testimony on direct examination and the corresponding and illuminating voir dire are, in relevant part, as follows:

voir dire and later on cross-examination, that the wit-
ness could neither define the term "subterfuge" nor
explain the political reasoning behind the statements

---

*Q.* . . . Let me show you what has been marked as Exhibit H
and ask if that is a letter which you wrote to a newspaper?

*A.* Yes, I had someone write it out for me because my handwrit-
ing is not too legible, and I signed it.

*Q.* The person who wrote that out, did they do so at your
request?

*A.* Well, yes, I requested it.

*Q.* And to what newspaper was that addressed?

*A.* To the Chronicle.

*Q.* Do you know whether it was published or whether there are
plans for publication?

*A.* Well, I talked with Sam Logan and he said there are plans for
publication.

\*     \*     \*

VOIR DIRE

*Q.* What does the word "subterfuge" mean?

*A.* "Subterfuge?"

*Q.* Yes.

*A.* I don't know.

*Q.* You don't know?

*A.* No. Would you tell me what it means?

*Q.* Not at this time. Who wrote this letter?

*A.* Well, someone wrote it. A friend.

*Q.* Who is the someone?

*A.* A friend.

*Q.* Who is the friend?

*A.* I had rather not say.

*Q.* Well, you are under oath and you are obligated to say. So
would you please tell the Court who it is that wrote this letter that
has been marked as Exhibit H.

*The Court*: You have to answer, Ms. Smith.

*Q.* . . . Who wrote the letter, ma'am?

*The Witness*: I have to answer that?

*The Court*: Yes.

*A.* Well, I had Judge Ferrara write that for me.

*Q.* . . . And when did Judge Ferrara write it?

*A.* About two weeks ago.

contained in the last paragraph of the letter. The master found the witness to be credible, but that

> [h]ad it not been for the Examiner's voir dire, I am doubtful that the letter's recent vintage would have been revealed or, indeed, that it has essentially been drafted by Respondent.
>
> *　　*　　*
>
> It is clear from Respondent's defense that she placed great importance on the testimony of character witnesses and understandable concern over negative publicity and negative correspondence received by Judge Rashid. It is equally clear from her later testimony that she gave little or no thought to the consequences associated with her participation in the production of the Smith letter or that its existence would have a negligible evidentiary impact on the outcome of the formal hearing.

We agree with the commission's findings of fact and conclusion of law pertaining to respondent's attempts to introduce the letter. Judge Ferrara's failure to divulge the source and circumstances surrounding the Smith letter constitutes an obstruction of justice and lack of candor with the tribunal violative of Canons 2A and 2B and MCR 9.205(C)(4). Judge Ferrara's silence while Ms. Smith was cross-examined regarding the source of the letter, which Smith vaguely identified as "a friend," shows a lack of candor with the tribunal. Before cross-examination, the evidence presented was clearly intended to create the false impression that the letter was written before the hearing, to respond to the negative press, and without any assistance by Judge Ferrara.[16] Respondent's counsel informed this Court that she did not tell him the

---

[16] Indeed, Smith, before voir dire by the examiner, testified:

critical fact that she wrote the letter when she handed it to him just moments before he called Ms. Smith to the stand.

As if to add insult to injury, respondent made a second attempt to admit the contents of the Smith letter. Only two days after the initial attempt to admit the letter, respondent secured another letter, expressing the same sentiments as the original, from the witness' house. This second letter differed from the first by containing a date, October 29, 1997, and being written entirely in Ms. Smith's own handwriting, as if such changes would make amends for the prior attempted fraud on the Court. Even on respondent's second attempt at admission, when questioned more directly about the political analysis contained in the last paragraph, Ms. Smith still could not explain what again were being presented as her sentiments. This second attempt at admission is glaring evidence of respondent's inability to admit her shortcomings and to conform to judicial standards of conduct. We agree that deception of this sort is " 'antithetical to the role of a Judge who is sworn to uphold the law and seek the truth' . . . ." *In re Collazo*, 91 NY2d 251, 255; 691 NE2d 1021 (1998), quoting *Matter of Myers*, 67 NY2d 550, 554; 496 NE2d 207 (1986).

---

*Q.* Do you know whether [the letter] was published or whether there are plans for publication?

*A.* Well, I talked with Sam Logan and he said there are plans for publication.

Moreover, when the examiner objected to admission of the letter on the basis of relevance, respondent's counsel replied:

*Mr. Bendure*: We have had newspaper articles admitted over our objection by the examiner and I want to get into the other side of the story.

### C. OTHER GROUNDS FOR MISCONDUCT

We also adopt the commission's findings that "Respondent's conduct throughout the formal hearing was inappropriate, unprofessional, and demonstrated a lack of respect" for the judicial discipline proceedings. While the incidents are too numerous to recount, such as respondent's failure to observe appropriate courtroom decorum by interrupting opposing counsel and the master on several occasions and by making snide side comments, we do note a few particularly egregious examples.

Respondent's evidence and testimony were replete with half-truths and misleading statements, such as when respondent attempted to introduce evidence that her ex-husband planted a "bug" (electronic surveillance device) on her phone line. Respondent's witness Robert Maul testified that he discovered the "bug" on her home phone line and that the "bug" was subsequently turned over to the Grosse Pointe police. Respondent also testified that Tarjeft had installed such a "bug" on her home phone line. On cross-examination, the examiner questioned respondent about her subsequent attempts to determine whether the FBI, to whom the police gave the "bug" for testing, found that the device was, in fact, operable. Initially, respondent testified that she made follow-up calls to the police roughly once a month for a year. Upon further questioning, however, she effectively recanted this claim and simply stated that she made several calls after filing the report. While respondent attempted to admit the police report, she failed to indicate that the police file also contained the FBI report regarding the "bug." That report concluded

that the "bug" was not an electronic surveillance
device at all, but merely a piece of metal.

On other occasions respondent's testimony was so
unnecessarily vague as to hinder the proceedings and
significantly interfere with the administration of jus-
tice. This misconduct is particularly evident in
respondent's testimony directly after respondent
agreed to resume questioning about the tapes in an
effort to purge the master's civil contempt order.

This testimony came after respondent claimed pri-
vacy rights under 18 USC 2515, the federal wiretap-
ping statute, once the tapes were admitted into evi-
dence. This privilege was asserted despite her volun-
tary statements regarding the tapes to the press, and
despite her prior testimony on the subject. Respon-
dent raised arguments similar to those heard at length
and found to be unpersuasive by the master earlier in
the proceedings. The master found the examiner's
arguments that the federal law did not provide a privi-
lege, and, even if it did, it was effectively waived by
respondent, given her comments to the press and
prior testimony, to be persuasive. Accordingly, the
master granted the examiner's motion for civil con-
tempt, but, after filing of additional memorandum,
denied the examiner's request for a default. Respon-
dent was informed that the contempt order could be
purged by answering the examiner's questions regard-
ing the tapes. Respondent agreed to answer these
questions, but in so doing, respondent offered evasive
testimony illustrative of her failure to accept and
truly comply with the master's order. For example,
respondent insisted she could not remember hearing
the taped statements that were played for her in court
just six days earlier and also refused to divulge her

phone number when asked. The continued examination proved futile and was quickly concluded.

### IV. APPROPRIATE DISCIPLINE

Judicial disciplinary proceedings are unique and "fundamentally distinct" from all other criminal or civil legal proceedings. 437 Mich 28. The purpose of such proceedings is to "protect the people from corruption and abuse on the part of those who wield judicial power." *Id.* Our primary concern in determining the appropriate sanction is to restore and maintain the dignity and impartiality of the judiciary and to protect the public.

We adopt the commission's recommendation and find respondent's untruthful and misleading statements to the public and press, her attempt to commit a fraud on the Court by twice attempting to introduce the Avela Smith letters, and her unprofessional and disrespectful conduct during each stage of the proceedings to constitute misconduct in violation of the court rules and judicial canons.

Indeed, we demand strict compliance with the letter and spirit of these rules and canons because, without it, our judicial system, which depends on public confidence in the integrity and impartiality of the judiciary would surely fail. Judges, occupying the watchtower of our system of justice, should preserve, if not uplift, the standard of truth, not trample it underfoot or hide in its shady recesses. This is precisely why judges should be exemplars of respectful, forthright, and appropriate conduct.

The effectiveness of our judicial system is dependent upon the public's trust. Violations such as those described herein, which mislead, misrepresent, and

deceive with respect to evidence and facts in legal proceedings, so seriously undermine that trust and are so fundamentally contrary to judicial temperament and obligation as to require the most severe form of discipline—removal. Our decision is based on the nature, extent, and frequency of the misconduct. Accordingly, we adopt the commission's recommendation to remove respondent because we find it is necessary to restore and maintain the dignity and honor of the judiciary and, most importantly, to best protect the public.

Pursuant to MCR 7.317(C)(3), the clerk is directed to issue the judgment order forthwith.

MALLETT, C.J., and BRICKLEY, BOYLE, and TAYLOR JJ., concurred with WEAVER, J.

CAVANAGH, J.  I concur with the result reached by the majority today. I write separately, however, to clarify the exact basis on which I reach this decision.

I

The Court has decided to base the action taken today only on conduct other than the respondent's statements as recorded on the various tapes. In doing so, the Court declines to resolve the legitimate constitutional questions raised by counsel for the respondent. I agree with this decision because prudence requires that we continue to resist addressing constitutional questions unless truly necessary. Given the action taken by the Court today, there is no need to look further and reach the constitutional questions raised by counsel for the defense.

II

Of the conduct, other than the statements, which the respondent is charged with, I base my concurrence in the sanction of removal from office on the respondent's actions regarding the Avela Smith letter. As the majority's recitation of the facts aptly demonstrates, respondent undertook a substantial amount of effort to present this letter to the master and to see that it was offered as something other than what it truly was. While respondent is clearly entitled to present a defense, and to do so vigorously, she is not entitled to attempt to perpetrate a fraud upon the master in the course of doing so. I find this conduct to violate MCR 9.205(C)(4), being conduct clearly prejudicial to the administration of justice. Furthermore, such conduct must also be found to violate the Code of Judicial Conduct, Canon 2, because it clearly presents both an appearance of, and actual, impropriety, as well as indicating a failure to respect and observe the law and promote public confidence in the judiciary.

My review of our past decisions in judicial discipline matters leads me to believe that a significant suspension would be consistent with our past decisions in these matters. Unfortunately, however, our past decisions provide only limited guidance in judicial tenure matters, where our goal must be the protection of the public and the preservation of the integrity of our judicial system. In doing so, we consider conduct that is often widely divergent, and circumstances that are sometimes unique. There are many underlying circumstances to this case, some of which we have declined to review. In attempting to relate other circumstances herein to the underlying basis for

discipline, I believe the majority visits conduct that, although often distasteful and questionable, is nonetheless insufficient to amount to a basis for increased sanctions.

I decline to join in that portion of the majority opinion addressing conduct other than the Avela Smith letter. I find that our action today, however framed, is equivalent to a suspension of approximately two and one-half years. Keeping this in mind, I am able to agree with the majority's decision to remove respondent from the bench. While the respondent will be able to again run for judicial office if she so chooses, like the majority, I share a faith that the electorate will have no desire to return respondent to the bench.

KELLY, J., concurred with CAVANAGH, J.