# Order

**Michigan Supreme Court**
**Lansing, Michigan**

Robert P. Young, Jr.,
Chief Justice

Michael F. Cavanagh
Marilyn Kelly
Stephen J. Markman
Diane M. Hathaway
Mary Beth Kelly
Brian K. Zahra,
Justices

December 15, 2011

143942

IN RE:

HONORABLE SYLVIA A. JAMES
22ND DISTRICT COURT

BEFORE THE JUDICIAL TENURE COMMISSION

SC: 143942
JTC: Formal Complaint 88

_____/

On order of the Court, the petition for interim suspension is considered, and it is GRANTED. The Honorable Sylvia A. James, Judge of the 22nd District Court, is suspended with pay until further order of this Court. In order to expedite the resolution of this matter, we ORDER the Judicial Tenure Commission and the Master to coordinate their schedules to ensure that the JTC recommendation of action, if any, will be submitted to this Court within five months of the date of this order. See MCR 9.207(F) and 9.219(A).

YOUNG, C.J. (*concurring*).

There is no gainsaying that the dissent's demand that Judge James' pay be withheld has a strong populist appeal. She has, after all, been publicly accused of very serious offenses. I write to explain why this appeal should be resisted.

In this Court's history, a judge accused of wrongdoing has been suspended without pay prior to the completion of the Judicial Tenure Commission (JTC) adjudicative process only under a very rare set of circumstances – where the misconduct had already been conclusively established, rendering the JTC's determination of misconduct largely irrelevant.[1] Here, the dissent would suspend the respondent without pay based on allegations, before her misconduct has been proven at a hearing. For the

---

[1] There have been only three occasions where this Court has ordered a suspension without pay before the completion of the JTC hearing. Two involved judges who had been convicted of crimes prior to the resolution of judicial disciplinary proceedings. See *In re Callanan,* 419 Mich 376 (1984), and *In re Szymanski.* In *In re Lawrence*, 417 Mich 1129 (1983), the third such matter, the judge *admitted* that he had not performed the duties of his judicial office.

foregoing reasons, I believe that placing respondent on interim suspension without pay is inappropriate.[2]

The dissent asserts that "the total amount of public funds respondent is alleged to have misappropriated . . . is $131,030." However troubling, these are *allegations* rather than established fact; moreover, the allegations are *disputed* by Judge James.[3]

Because the allegations have not been tested and proven in a hearing, at this point it should not be assumed that the most serious allegations will be proved. Similarly, even if the lesser allegations are proved, it is not certain that the appropriate sanction would exceed the suspension from office that respondent will have already incurred by being placed on administrative leave as well as any sanction served in response to the JTC's petition to suspend.

The dissent cites three justifications favoring suspending respondent without pay: (1) a "potentially diminished regard for the self-disciplinary processes of the judiciary[;]" (2) the diminished likelihood of recovering "misappropriated public funds" for the City of Inkster; and (3) the diminished likelihood of recovering the misappropriated funds to provide "adequate restitution" to crime victims.

First, the entire thrust of the dissent is that more "discipline" needs to be meted out to Judge James by this Court now before the charges leveled against her are even heard by the JTC. The rationale for the dissent falters because the dissenter seeks either to make respondent an example (to prevent other judges from engaging in the kind of peculation with which she is charged)[4] or transform a disciplinary process into a

---

[2] I do not need to address the question of our underlying authority to suspend a judge without pay prior to the JTC's determination of misconduct because I address *prudential* reasons why we should not exercise that authority in this case. The precedents of this Court establish a *prudential* limitation that we ought not exercise such authority when the underlying misconduct is contested. Unlike the dissenting justice, I believe that prudential limitation is a wise one that should be respected.

[3] This point is made more emphatic because the JTC has not even requested that respondent have her pay withheld pending resolution of the merits of its charges against her.

[4] The dissent's clear message to judges is that—whether guilty or not—they had better not stand *accused* of wrongdoing because the mere accusation of wrongdoing is enough to warrant withholding a judge's salary in order to "mitigate" the effects of alleged wrongdoing. Admittedly, this is a *very* strong message—challenging JTC allegations will impoverish you—and it treads perilously close to prejudging an accused's guilt; we

restitution recovery mechanism. According to the dissent, the Court's failure to make this additional sanction will undermine regard for the judiciary and demonstrate that the Court is unconcerned about the seriousness of these charges. All of these concerns are without foundation or actually undermine important principles of due process that this Court ought always to vindicate.

In placing respondent on administrative leave earlier this year, this Court promptly responded to the results of the SCAO audit that showed some irregularities. The matter was then immediately turned over to the JTC for investigation. In so doing, this Court prevented any additional harm that the respondent *might* have caused by continuing to administer the 22nd District Court. Thus, suspension without pay is not related to the recovery of any funds that may have been misappropriated by Judge James prior to being placed on administrative leave. The dissenter does not dispute this fact, he merely ignores it because it undercuts his restitution argument.

Nor can it reasonably be said that this Court's failure to suspend respondent without pay does anything to diminish "the public regard for the self-disciplinary process." Withholding respondent's pay before completing the adjudicative process results in the very harm the dissent claims to fear – "diminished regard for the self-disciplinary processes of the judiciary." Indeed, where the material facts are in dispute, those concerned with the integrity of the judicial system and "the public regard for the self-disciplinary process" should *insist upon* permitting the JTC process to conclude before the imposition of the punishment the dissent favors. While a lynch mob is surely effective in dispensing its view of justice without benefit of a trial, the judicial system is designed to be a bulwark against this and other forms of "mob justice." Consistent with our commitment to having guilt determined *after* a trial, the Court's action today both protects the public and maintains the integrity of the self-disciplinary process. Moreover, by order issued today, this Court has expedited the JTC proceedings to ensure that resolution of this matter occurs as quickly as possible.

The dissent, while purporting to understand the principles of our judicial disciplinary system, fails utterly to apply them. This is best illustrated by the dissent's inexorable focus on the desire to secure "restitution" – for the victims of crime and the citizens of Inkster. This restitutionary justification for withholding pay before a JTC adjudication is entirely without legal foundation in the judicial disciplinary system. As the dissent acknowledges, the purpose of judicial disciplinary proceedings "is not to impose punishment on the respondent judge, *or to exact any civil recovery*, but to protect the people from corruption and abuse on the part of those who wield judicial power."[5]

ordinarily allow people accused of wrongdoing the benefit of a trial *before* sanctioning them.

[5] *In re Jenkins*, 437 Mich 15, 28 (1991) (emphasis added).

However, this is *precisely* what the dissent seeks to accomplish—to exact a civil recovery for judicial wrongdoing.[6]

Significantly, and consistent with the principles stated above, Art 6 Sec 30 of our constitution makes no provision for restitution as a sanction, nor is such a sanction easily reconciled with those sanctions specifically enumerated. Consequently, it is not surprising that the JTC rules do not provide a mechanism for "restitution." Accordingly, the dissent's justification for suspending respondent without pay prior to the JTC process is premised on a reason that is *inappropriate* to the very purpose of judicial disciplinary proceedings. This is all made worse by the fact that the dissent exacts "restitution" *before* a determination of guilt.[7]

This case has gathered a fair bit of public notoriety in the media. Regardless, the role of the courts – and the role of the JTC process – is to ensure the rule of law. Media coverage is not grounds to end run the JTC process. While "sentence first – verdict afterwards" might satisfy the Queen of Hearts,[8] I believe it is inappropriate to suspend respondent without pay when the underlying claims of misconduct are contested. Doing so disserves any Court aspiring to follow the rule of law.

MARKMAN, J. (*concurring in part and dissenting in part*).

I respectfully dissent from the Court's order to the extent that it grants the Judicial Tenure Commission's petition for respondent's interim suspension *with* continued salary. Instead, I would order the suspension without salary, and have respondent's salary held in escrow pending the final resolution of her disciplinary proceedings.

The JTC's complaint alleges that respondent, the chief judge of the 22nd District Court in Inkster, has misappropriated approximately $131,000 in public funds. Specifically, the complaint alleges that she employed a checking account established for an alternative sentencing program, the Community Service Program (CSP), as "her

---

[6] Under our rules, a disciplined judge may be ordered to pay costs and fees *to the commission*, but only where the judge makes misrepresentations or misleading statements *during the JTC adjudicatory* process. MCR 9.205(B).

[7] The right to restitution for victims is available only for *criminal acts* and this right has been established by statute. Needless to say, a JTC proceeding is not a criminal prosecution. I am aware of no basis for the citizens of Inkster to recover "restitution" under any circumstance based on the allegations lodged against Judge James, and the dissent provides none. However, the dissent is undeterred by these legal "trivialities" in its determination to make an "example" of the respondent.

[8] Carroll, *Alice's Adventures in Wonderland*, p 179 (Philadelphia, Pa: H Altemus, 1896).

personal slush fund." The JTC further alleges that 50% of the monies collected through CSP were required to be applied to crime victim restitution, and that this did not occur.

I would not allow the respondent to receive additional public funds during her present suspension — one predicated upon allegations of past misappropriations of public funds — and would instead hold her salary in escrow pending resolution of disciplinary proceedings. In my judgment, both the breadth and the explicitness of our authority under the Constitution make clear that there is constitutional warrant in this Court to undertake this action. Although I do not believe the majority acts unreasonably in choosing *not* to exercise this authority, I also do not believe that my decision to the contrary is unreasonable. By the time this matter is finally resolved by the Tenure Commission and this Court, respondent will have been provided between 12-15 months of additional salary, without having performed a single day of judicial service for the people of her District.

In light of this Court's "extraordinary" constitutional authority over matters of judicial discipline — an authority that is "bounded only by the exigencies which call for its exercise," and in light of our separate constitutional authority to "suspend [a judge] with or without salary," I believe this Court clearly possesses the authority to ensure that, where a judge has been alleged to have misappropriated public funds, reasonable precautions can be taken to ensure that if the allegations are eventually borne out, (a) the judge will not financially benefit by the misappropriation; and (b) the taxpayer and the intended beneficiaries of the public funds, in this case the victims of crime within Inkster, will be afforded some possibility of restitution. Reasonable precautions can be undertaken by a court in advance of trial even in a *criminal* matter to protect the interests of the public, and this Court's authority to uphold the integrity and reputation of the judiciary in a *non-criminal* disciplinary matter constitutes a far broader authority. Contrary to the concurrence, the exercise of such constitutional authority is not comparable to a "lynch mob," does not resemble "mob justice," involves no "prejudgment" of the charges against respondent," does not "disserve the rule of law," and is not otherwise "inappropriate" in any way.

## I. "ALLEGATIONS"

The concurrence asserts that my position is "inappropriate" because it fails to recognize that the allegations against respondent are not "established fact" and are "disputed." I am well aware of this, although I am also well aware that this is not a criminal proceeding, see Part II, *infra*, and there are considerations that come into play that are distinct, including those pertaining to the integrity of the judicial process, public confidence in the judiciary, and the protection of the public from judicial corruption. At this stage of the disciplinary process, all the Court has before it are allegations. Yet on the basis of allegations alone, each Justice must determine how to exercise his or her constitutional authority most responsibly. In my judgment, by exercising our authority to

suspend without salary (and to have this held in escrow), it will be made considerably *less* likely that respondent could potentially benefit financially by the diversion of public funds, and it would be made considerably *more* likely that at least some restitution could potentially be made to taxpayers and to those who are the intended beneficiaries of these funds — *if* she is not ultimately vindicated. I do not believe that our Constitution, which grants this Court such broad judicial disciplinary authority, renders us helpless to achieve either of these objectives.

And it is no more to "ignore" that we have only allegations at this point than for a trial court to "ignore" this when it detains a criminal defendant pending trial, places conditions on a defendant's release pending trial, or otherwise takes into consideration prophylactic measures in order to protect the public or to avoid a risk of defendant's flight prior to trial. And in each of those circumstances — unlike in the instant matter — there is a *genuine* criminal proceeding. To read our Constitution as tying the hands of this Court in attempting to *mitigate* the damage of judicial corruption — *if* it is established — has no grounding in our state's Constitution.

A bit of perspective is in order:

-- Every member of the majority, as well as myself, supported placing respondent on administrative leave before this matter was ever referred to the JTC, and on the basis of evidence compiled by our own State Court Administrator's Office. Respondent will never be able to recover that lost service.

-- Every member of the majority, as well as myself, now supports suspending respondent, and doing so for an indefinite period, *before* the JTC has completed its investigation or issued a final report. Respondent again will never be able to recover that lost service.

The *only* difference between the majority's and my positions is that I would also place respondent's salary in escrow during her suspension, an action specifically contemplated by our Constitution. And in this regard, unlike respondent's loss of service, she *will* eventually be made whole if she is vindicated, for her salary will be held in escrow. The concurrence is plainly wrong in its assertion that I would "exact [restitution] before a determination of guilt." Rather, there would be no restitution until, and unless, misappropriation charges are established by the JTC and this Court. Pending such a determination, respondent's salary would be held in escrow in order that such funds not be dissipated, and the Constitution is explicit that the Court is authorized to suspend a judge "without salary."

With this bit of perspective, it is clear that whatever the merits of our respective positions, nothing even remotely implicates a failure on my part to appreciate that there

are only allegations against respondent, and that these have not yet been established. The single difference I have with the majority has no bearing in any way upon my determination to preserve a fair judicial disciplinary process. I am no less committed to a fair process for respondent than any other Justice of this Court, and I am no less mindful than any other Justice that there is a difference between allegations and proofs.

With regard to the concurrence's allusions to a "lynch mob" and to "mob justice" in describing my position as to Judge James, there is little that I can productively say concerning such discourse, and so I will hold my tongue. *Res ipsa loquitur*.

## II. PURPOSES OF JUDICIAL DISCIPLINE

"Judicial disciplinary proceedings are unique and 'fundamentally distinct' from all other criminal or civil legal proceedings." *In re Ferrara*, 458 Mich 350, 372 (1998). A judicial disciplinary proceeding "lacks the essential characteristics of a criminal prosecution." *In re Mikesell*, 396 Mich 517, 528 (1976) (Citation and quotation marks omitted.). Similarly, a disciplinary order from this Court "does not operate as a sanction for criminal guilt but as a judgment on judicial fitness." *Id.* This Court has repeatedly stated that the object of these proceedings "is not to inflict punishment." *Id.* (Citation and quotation marks omitted.); see also *In re Jenkins*, 437 Mich 15, 28 (1991); *In re Moore*, 464 Mich 98, 118 (2001); *In re Haley*, 476 Mich 180, 195 (2006). Rather, the purpose is "to determine whether one who exercises judicial power is unfit to hold a judgeship," *Mikesell,* 396 Mich at 528; "to maintain the integrity of the judicial process," *Haley,* 476 Mich at 195; "to restore and maintain the dignity and impartiality of the judiciary," *In re Ferrara*, 472 Mich at 371; and "to protect the people from corruption and abuse on the part of those who wield judicial power." *In re Jenkins*, 437 Mich at 28. "The judicial system is for the benefit of the litigant and the public, not the judiciary." Code of Judicial Conduct, Canon 1.

## III. CONSTITUTIONAL AUTHORITY

This Court has ordered interim suspensions without pay in the past, see, e.g., *In re Lawrence*, 417 Mich 1129 (1983), and, in my judgment, there is no doubt regarding our authority to do so.[9] "Our authority to discipline members of the state judiciary flows

---

[9] The concurrence believes that it does "not need to address the question of our underlying authority to suspend a judge without pay prior to the JTC's determination of misconduct," believing it sufficient to address only the "*prudential* reasons why we should not exercise that authority in this case." This strikes me as exactly backwards. One might think that an assessment of our "underlying authority" would be a first step in assessing the disciplinary issue before this Court, and that this would be done *before* assessing any supposed "prudential" limits on that authority. See *infra* at n 3. If, as with the concurrence, I had not resolved the question of our underlying authority, I too would

from two sources, §§ 30 and 4 of article 6 of the Michigan Constitution." *In re Probert*, 411 Mich 210, 229 (1981). Const 1963, art 6, § 4 embodies a general grant of power, the power of superintending control. It states in relevant part:

> The supreme court shall have general superintending control over all courts. . . . The supreme court shall not have the power to remove a judge.

We elaborated upon the breadth of this power in *In re Huff*, 352 Mich 402, 417-418 (1958):

> "The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. Moreover, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to invent, frame, and formulate new and additional means, writs, and processes whereby it may be exerted." [Quoting 14 Am Jur, Courts § 256]

The principal limit to the "extraordinary power" of judicial superintendency under our Constitution is that "[t]he supreme court shall not have the power to remove a judge." Const 1963, art 6, § 4. Our case-law makes clear that a suspension — with or without pay — is not tantamount to removal. In *Probert*, 411 Mich at 229 n 11, we looked to definitions of these terms and explained:

> "Suspension" is defined as "[a]n ad interim stoppage or arrest of official power and pay;—not synonymous with 'removal' which terminates wholly the incumbency of the office or employment." [Quoting Black's Law Dictionary (4th rev ed).]

Accordingly, suspending respondent without salary pending the resolution of her disciplinary proceedings does not impinge on § 4's exclusive limitation. Ordering her salary placed in escrow for the pendency of these proceedings is fully consistent, in my judgment, with this Court's power "to invent, frame, and formulate new and additional means, writs, and processes whereby [our superintending control authority] may be exerted." *In re Huff*, 352 Mich at 418. Indeed, it is precisely this superintending power that has *already* served as the basis for this Court placing respondent on administrative

---

have reached the same conclusion as the concurrence, for this Court can never act without authority.

leave earlier this year. Surely, the same broad superintending authority that was exercised by this Court *before* the JTC acted can also be exercised *afterwards*.

The other source of our disciplinary authority, Const 1963, art 6, § 30, prescribes the actions that this Court may undertake in a disciplinary matter. Section 30(2) states in pertinent part:

> On recommendation of the judicial tenure commission, the supreme court may . . . suspend *with or without salary*, . . . for . . . misconduct in office . . . or conduct that is clearly prejudicial to the administration of justice. [Emphasis added.]

Section 30(2) grants the Court the authority to suspend "without salary" "on recommendation" of the JTC. While respondent argues that "recommendation" should be given a technical meaning — as referring only to the JTC's final "recommendation" — it seems clear that the petition for interim suspension is equally a "recommendation." That is, the JTC has conducted an initial investigation and determined, in its judgment, that an interim suspension is warranted. However, because the JTC lacks the authority to impose a suspension, it is petitioning this Court, which does possess such authority. It is difficult to understand how this can be characterized as anything other than a "recommendation" by the JTC.[10] Accordingly, this Court has the authority to suspend "with or without salary." Indeed, this authority is confirmed by the majority's own action in suspending the respondent *with* salary, for there is no constitutional distinction between a suspension "with or without salary."

For these reasons, I believe that both §§ 4 and 30(2) of our Constitution provide this Court with the clear authority to order the interim suspension of respondent without salary and to have these funds held in escrow pending the resolution of disciplinary proceedings.[11]

---

[10] Although the exercise of this Court's disciplinary authority must be *triggered* by a JTC "recommendation," we have not viewed ourselves as bound by its *specific* recommendation. See, e.g., *In re Cynthia Hathaway*, 464 Mich 672 (2001). In any event, the JTC is *silent* in this matter as to whether its recommended suspension should be with or without pay.

[11] This conclusion is consistent with our precedents, which make clear that this Court possesses the constitutional authority to suspend a judge without salary. See, e.g., *In re Callanan*, 419 Mich 376 (1984); *In re Lawrence*, 417 Mich 1129 (1983); *In re Szymanski*, 394 Mich 798 (1975). The "prudential limits" to this authority identified by the concurrence has neither been articulated by this Court nor is it compatible with the breadth of our disciplinary authority under Const 1963, § 4. See *Huff*, *supra* at Part III.

## IV. EXERCISE OF CONSTITUTIONAL AUTHORITY

Having determined that this Court possesses the constitutional authority to suspend on an interim basis without pay, the harder question, in my judgment, is whether we should *exercise* this authority in a particular matter. In making this determination, I remain mindful of the nature and the purposes of judicial disciplinary proceedings. See Part II, *supra*.

As explained in *Probert*, 411 Mich at 225, in making a determination in a judicial discipline matter, the Court

> must be responsive to individual considerations . . . . [But such] decision . . . must also be responsive to a significant institutional consideration, the preservation of the integrity of the judicial system. [Citation and quotation marks omitted.]

In light of this concern, I believe that it is a proper exercise of our authority in this matter to suspend respondent without salary, and to place her salary in escrow pending final resolution of this matter. I would not take this action to impose "punishment," or as a "sanction for criminal guilt," any more than would the majority, but rather: (a) to protect the "institution," and preserve the "integrity" of the judiciary; and (b) to afford some reasonable prospect for the recovery of public funds for their intended purpose if respondent is not ultimately vindicated of the JTC's allegations.

That is, I would not *continue* to compensate respondent with public funds during an indefinite suspension premised upon — indeed, necessitated by — allegations of past misappropriations of public funds. While respondent may ultimately be vindicated, and while this Court cannot fully undo any damage caused to the judiciary if she is *not* ultimately vindicated, we can at least undertake responsible action within our authority to *mitigate* such damage. By exercising our authority to suspend without salary (and to have this held in escrow), it would be made considerably *less* likely that respondent could potentially benefit financially by the diversion of public funds, and it would be made considerably *more* likely that at least some restitution could potentially be made to taxpayers — *if* she is not ultimately vindicated.[12] I do not believe that our Constitution,

---

[12] Whatever "message" to *judges* the concurrence deconstructs from this dissent, the only intended message is to the *public*. And it is that this Court should be prepared to do what is reasonably within our constitutional authority to ensure that a judge who misappropriates public funds does not benefit from such conduct, and that restitution will be afforded the victims of such misconduct, whether that be taxpayers or the intended beneficiaries of public programs. The concurrence notwithstanding, the judicial disciplinary process is not a "criminal trial" process, but it is intended principally to

which grants this Court broad disciplinary authority "to invent, frame, and formulate new and additional means, writs, and processes," renders us helpless to achieve either of these ends.[13]

In coming to these conclusions, I seek to balance the respective harms of our alternative courses of action. On the one hand, withholding respondent's salary until after the charges against her have been fully resolved poses a potential, albeit temporary, harm if she is eventually vindicated because her salary would have been withheld during this time. This is a legitimate concern, and it is why I believe the majority's course of action is not unreasonable. On the other hand, there are the competing harms if respondent is not ultimately vindicated: (a) the diminished likelihood that misappropriated funds will ever be recovered on behalf of the people of Inkster; (b) the diminished likelihood that adequate restitution will ever be afforded the victims of crime for whom such funds were intended; and (c) the potentially diminished public regard for the self-disciplinary processes of this judiciary.

## V. "POPULIST APPEAL"

I do not know exactly what the concurrence has in mind when it describes my position as having "strong populist appeal," an odd response to a dissent. I suppose it is to intimate that my position cannot also be legally sound, or that it has been undertaken on the basis of improper considerations. I am confident that a review of my record on this Court will make clear that I have cast no fewer "hard" or "non-populist" votes than other Justices, and that I have decided cases on the basis only of what, in my judgment, was required by the law, "strong populist appeal" or not. If on this occasion, there happens to be "strong populist appeal" for my position, then I am pleased, for I

---

"protect the people from corruption and abuse on the part of those who wield judicial power." See Part II, *supra*.

[13] Although I disagree with the concurrence that this Court could not itself order restitution in a proper case, it is worth noting that precautions to prevent the dissipation of misappropriated public funds also serve the interest of justice in the event that a respondent voluntarily consents to pay restitution or is criminally prosecuted and required to pay restitution. Moreover, it bears repeating that my position "exacts" no restitution, but rather holds respondent's salary in *escrow* in order to make it more likely that some restitution *could* be made *if* she is not ultimately vindicated.

believe it is the correct position. This may also be indicative that I have been mindful that "the judicial [discipline] system is for the benefit of the litigant and the public, not the judiciary." Code of Judicial Conduct, Canon 1.

## VI. CONCLUSION

In conclusion, I believe that the potential harm to the integrity of the judiciary, to the treasury, and to public confidence in the judicial disciplinary process outweighs the undeniable, albeit temporary, harm to respondent. As a result, consistent with our authority under §§ 4 and 30(2) of Article 6 of the Constitution, and in the present circumstances in which allegations of judicial misconduct involve the misappropriation of public funds, I would order respondent's interim suspension without salary, and that her salary be held in escrow until the charges have been resolved.



I, Corbin R. Davis, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

December 15, 2011 _____  _____

t1214                                                    Clerk