**Lansing, Michigan**

# Opinion

Chief Justice:          Justices:

Robert P. Young, Jr.    Michael F. Cavanagh
                        Marilyn Kelly
                        Stephen J. Markman
                        Diane M. Hathaway
                        Mary Beth Kelly
                        Brian K. Zahra

FILED JULY 31, 2012

S T A T E  O F  M I C H I G A N

SUPREME COURT

*In re* Honorable SYLVIA A. JAMES,                    No. 143942
Judge, 22d District Court

BEFORE THE ENTIRE BENCH

MARILYN KELLY, J.

The Judicial Tenure Commission (JTC) has recommended that this Court remove 22d District Court Judge Sylvia A. James from office for judicial misconduct. Judge James (respondent) has filed a petition asking this Court to reject that recommendation. We affirm the JTC's findings and its recommendation and conclude that it is necessary and appropriate to remove Judge James from office for the remainder of her term.

The evidence establishes that respondent misappropriated public funds, some of which were intended for victims of crime in the city of Inkster. She inappropriately spent much of this money on self-promoting advertisements and travel expenses for herself and various other court employees. She treated these funds, as the master phrased it, as her own "publicly funded private foundation." In addition, she (1) denied people access to

the court by instituting and enforcing an improper business-attire policy, (2) employed a family member in violation of court policy, and (3) made numerous misrepresentations of fact under oath during the investigation and hearing of this matter.

The cumulative effect of respondent's misconduct, coupled with its duration, nature, and pervasiveness, convinces this Court that she is unfit for judicial office. Although some of her misconduct, considered in isolation, does not justify such a severe sanction, taken as a whole her misconduct rises to a level that requires her removal from office. Therefore, we adopt the recommendations of the JTC, except with respect to the costs respondent will be ordered to pay, as will be detailed later.

## I. FACTS AND PROCEDURAL HISTORY

Respondent is the sole judge in the 22d District Court in Inkster, Michigan. She is bound by the standards for discipline set forth in MCR 9.104 and MCR 9.205[1] and is subject to the duties and responsibilities imposed on her by this Court.

---

[1] MCR 9.104, entitled in part "Grounds for Discipline in General," states in relevant part:

> The following acts or omissions by an attorney, individually or in concert with another person, are misconduct and grounds for discipline, whether or not occurring in the course of an attorney-client relationship:
>
> (1) conduct prejudicial to the proper administration of justice;
>
> (2) conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach;
>
> (3) conduct that is contrary to justice, ethics, honesty, or good morals;
>
> (4) conduct that violates the standards or rules of professional conduct adopted by the Supreme Court;

2

(5) conduct that violates a criminal law of a state or of the United States, an ordinance, or tribal law pursuant to MCR 2.615;

(6) knowing misrepresentation of any facts or circumstances surrounding a request for investigation or complaint;

(7) failure to answer a request for investigation or complaint in conformity with MCR 9.113 and MCR 9.115(D);

(8) contempt of the board or a hearing panel[.]

MCR 9.205, entitled "Standards of Judicial Conduct," states:

(A) Responsibility of Judge. A judge is personally responsible for the judge's own behavior and for the proper conduct and administration of the court in which the judge presides.

(B) Grounds for Action. A judge is subject to censure, suspension with or without pay . . . or removal for . . . misconduct in office, persistent failure to perform judicial duties, habitual intemperance, or conduct that is clearly prejudicial to the administration of justice. In addition to any other sanction imposed, a judge may be ordered to pay the costs, fees, and expenses incurred by the commission in prosecuting the complaint only if the judge engaged in conduct involving fraud, deceit, or intentional misrepresentation, or if the judge made misleading statements to the commission, the commission's investigators, the master, or the Supreme Court.

 (1) Misconduct in office includes, but is not limited to:

* * *

(e) misuse of judicial office for personal advantage or gain, or for the advantage or gain of another; and

(f) failure to cooperate with a reasonable request made by the commission in its investigation of a judge.

(2) Conduct in violation of the Code of Judicial Conduct or the Rules of Professional Conduct may constitute a ground for action with regard to a judge, whether the conduct occurred before or after the respondent became a judge or was related to judicial office.

3

On October 26, 2011, the JTC filed Formal Complaint No. 88 against respondent, alleging four counts of misconduct.[2] It asserted that respondent had engaged in (1) financial improprieties, (2) administrative improprieties, (3) employment improprieties, and (4) misrepresentations to the JTC. On that same date, it also filed a petition for interim suspension and a request for appointment of a master. On December 15, 2011, this Court appointed retired District Court Judge Ann Mattson as the master and ordered respondent suspended from office with pay until further order of the Court.[3] She has been on suspension ever since.

A formal master's hearing began on January 23, 2012, and concluded on March 1, 2012. On April 23, 2012, the master filed her findings of fact and conclusions of law with the JTC. She concluded that the examiner had proven portions of all four counts by a preponderance of the evidence.[4] In summary, the master stated that "[r]espondent failed to diligently discharge her administrative responsibilities . . . [and] [h]er actions

---

(3) In deciding whether action with regard to a judge is warranted, the commission shall consider all the circumstances, including the age of the allegations and the possibility of unfair prejudice to the judge because of the staleness of the allegations or unreasonable delay in pursuing the matter.

[2] An amended formal complaint was filed on March 1, 2012.

[3] *In re James*, 490 Mich 936 (2011).

[4] The examiner must present the evidence in support of the charges set forth in the complaint and at all times has the burden of proving the allegations by a preponderance of the evidence. MCR 9.211(A); see also *In re Ferrara*, 458 Mich 350, 360; 582 NW2d 817 (1998).

4

demonstrated her lack of respect for the law." Respondent was found to have committed misconduct in office as defined in Const 1963, art 6, § 30 and MCR 9.205(B)(1), and to have violated MCR 9.104(1) and (2); MCR 9.205(A); Code of Judicial Conduct, Canons 1, 2(A) through (C), 3(A)(1) and (2), 3(B)(1), and 6(B); MCL 600.4803; MCL 600.8379; MCL 750.174; MCL 750.175; MCL 750.218; MCL 600.8501; MCL 600.8507; MCL 750.249; and Administrative Order No. 1996-11.

The JTC issued its decision and recommendations for discipline on June 11, 2012. It adopted all but one[5] of the master's findings, concluding that "[r]espondent's prolonged and repeated pattern of misconduct in purposefully violating statutes, misappropriating public funds, and making intentional misrepresentations both before and after these proceedings commenced render her unfit to sit as a judge."

In determining the sanctions appropriate for respondent, the JTC considered the seven factors that the Court set forth in *In re Brown*.[6] It concluded that four of the seven weighed in favor of severe sanctions. It recommended that respondent be removed from office and that she pay $81,181.88 for costs, fees, and expenses incurred as a result of this investigation.

---

[5] The JTC did not adopt a finding by the master that respondent had misrepresented whether any food purchased with Community Service Program funds had ever been taken to her home.

[6] *In re Brown*, 461 Mich 1291 (2000).

## II. ANALYSIS

The Michigan Constitution grants this Court general superintending control over all the state courts in Michigan.[7] It authorizes this Court to "censure, suspend . . . or remove a judge for . . . misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice" upon recommendation of the JTC.[8] The Court may accept or reject the recommendations of the JTC or modify them by imposing greater, lesser, or entirely different sanctions.[9]

We review the recommendations of the JTC de novo.[10] We also review de novo the JTC's findings of fact.[11]

After reviewing the record and hearing oral arguments by the parties, the Court agrees with the findings of the JTC and adopts its recommendation regarding sanctions.

### A. FINANCIAL IMPROPRIETIES

The master and the JTC both found that respondent had engaged in inappropriate financial transactions and practices. We agree. The most significant misconduct involved respondent's misappropriation and abuse of Community Service Program (CSP)

---

[7] Const 1963, art 6, § 4.

[8] Const 1963, art 6, § 30(2).

[9] MCR 9.225.

[10] *Ferrara*, 458 Mich at 358-359.

[11] *In re Jenkins*, 437 Mich 15, 18; 465 NW2d 317 (1991).

6

funds.[12]  These funds were collected from members of the public and were indisputably subject to MCL 775.22 and MCL 780.826a,[13] which govern how they should be allotted.

---

[12]  Respondent established the CSP to make available sentencing alternatives for nonviolent defendants.  This type of program can be found at various courts in the state.  Defendants were sentenced to the CSP as an alternative to, or sometimes in addition to, incarceration.  They were charged $10 to $25 a day in oversight fees and were required to perform various community-service tasks within the city of Inkster, such as mowing lawns for the elderly and maintaining the court grounds.  Some of the fees were allocated to the CSP.

[13] MCL 775.22 states in relevant part:

> (1) If a person is subject to any combination of fines, costs, restitution, assessments, probation or parole supervision fees, or other payments arising out of the same criminal proceeding, money collected from that person for the payment of fines, costs, restitution, assessments, probation or parole supervision fees, or other payments shall be allocated as provided in this section.

> (2) Except as otherwise provided in this subsection, if a person is subject to payment of victim payments and any combination of other fines, costs, assessments, probation or parole supervision fees, or other payments, 50% of all money collected from that person shall be applied to payment of victim payments, and the balance shall be applied to payment of fines, costs, supervision fees, and other assessments or payments. If any fines, costs, supervision fees, or other assessments or payments remain unpaid after all of the victim payments have been paid, any additional money collected shall be applied to payment of those fines, costs, supervision fees, or other assessments or payments. If any victim payments remain unpaid after all of the fines, costs, supervision fees, or other assessments or payments have been paid, any additional money collected shall be applied toward payment of those victim payments.

The master and the JTC cited MCL 780.766a, the allocation provision in article 1 of the Crime Victim's Rights Act, MCL 780.751 *et seq.*, applicable to felonies.  It is clear that the intended reference was to MCL 780.826a, which is found in article 3 of that act, MCL 780.811 *et seq*.  This is the article applicable to misdemeanors, over which respondent presided. We note, however, that the two provisions are virtually identical and that the presumably inadvertent citation error does not affect our analysis or the result.

The statutes require that the first 50 percent of certain CSP-fund payments be allocated to crime victims in restitution for their financial losses as a result of criminal acts.

---

MCL 780.826a states in relevant part:

> (1) If a person is subject to any combination of fines, costs, restitution, assessments, probation or parole supervision fees, or other payments arising out of the same criminal proceeding, money collected from that person for the payment of fines, costs, restitution, assessments, probation or parole supervision fees, or other payments ordered to be paid in that proceeding shall be allocated as provided in this section. If a person is subject to fines, costs, restitution, assessments, probation or parole supervision fees, or other payments in more than 1 proceeding in a court and if a person making a payment on the fines, costs, restitution, assessments, probation or parole supervision fees, or other payments does not indicate the proceeding for which the payment is made, the court shall first apply the money paid to a proceeding in which there is unpaid restitution to be allocated as provided in this section.

> (2) Except as otherwise provided in this subsection, if a person is subject to payment of victim payments and any combination of other fines, costs, assessments, probation or parole supervision fees, or other payments, 50% of each payment collected by the court from that person shall be applied to payment of victim payments, and the balance shall be applied to payment of fines, costs, supervision fees, and other assessments or payments. If a person making a payment indicates that the payment is to be applied to victim payments, or if the payment is received as a result of a wage assignment under [MCL 780.826] or from the sheriff under [MCL 780.830a], the payment shall first be applied to victim payments. If any fines, costs, supervision fees, or other assessments or payments remain unpaid after all of the victim payments have been paid, any additional money collected shall be applied to payment of those fines, costs, supervision fees, or other assessments or payments. If any victim payments remain unpaid after all of the fines, costs, supervision fees, or other assessments or payments have been paid, any additional money collected shall be applied to payment of those victim payments.

The court's judicial information system (JIS) is programmed to automatically apply these payments in compliance with the statutes. Notwithstanding that fact, respondent ordered her clerks to override the JIS to allocate them first to the court's CSP account, which did not use the first 50 percent for crime-victim restitution.[14]

Respondent expended monies intended for crime-victim restitution and for additional legislatively mandated priorities to other sources in a manner that she alone controlled. She expended thousands of dollars on items having no relation to the operation of the CSP. She choose the charities and organizations that would receive the funds and personally signed each of the checks. Many of these expenditures were for advertisements that promoted the judge, prominently displaying her picture and only tangentially mentioning the CSP. She also allocated CSP funds to local charities of her choice[15] and spent them on travel[16] and other expenses as she deemed fit.[17]

---

[14] The master compared deposits in the court's CSP account before respondent's suspension with deposits made after respondent had been suspended. At that point, the interim judge who replaced respondent had directed the clerks to stop overriding the JIS system. For example during the month of August 2010, under respondent's administration, $7,366 was credited to the CSP account. During the month of August 2011, under the interim judge, only $433 was deposited into the CSP account. Respondent argued that the difference is because there were fewer participants in the program under the interim judge. The evidence established that this was not true. The interim judge testified that the program was fully operational in August 2011. The court's probation officer also supported this statement.

[15] Respondent authorized the distribution of more than $14,000 from the CSP account to local charitable, fraternal, and religious organizations from 2008 until her suspension in 2011. These expenditures included donations for a "table for ten at a testimonial event," a local basketball camp, a police auxiliary annual picnic, cheerleader uniforms, and a school "Europe fund." None was a proper operational expenditure of the CSP. Proper expenditures were only those that paid for the operation of the program, such as flowers to be planted or lawn mowers to maintain the lawns of needy Inkster senior citizens.

The facts also show that respondent authorized payments to three CSP codirectors of stipends in the amount of $650 a month. These individuals were paid as independent contractors, despite the fact that they were already salaried employees of respondent's court. Between late 2008 and early 2011, one of these individuals received more than $8000, the second more than $21,000, and the third more than $19,000 paid from CSP funds. Respondent required all three to submit monthly statements of tasks performed but did not require them to document how many hours they worked. Some of their CSP tasks were performed during regular court business hours. The individuals spent between 15 and 20 hours a week on CSP tasks and were paid each month, in advance, regardless of whether they submitted monthly reports. Also, they were paid without regard to the number of hours worked. In some instances, they were paid two or even three months in advance.

Respondent also failed to establish a budget for the CSP account, as mandated by MCL 600.8271. She claimed that she was "not put on notice" that she was required to

---

[16] Respondent also used the account to fund her own and other employees' travel expenses totaling $13,000, including travel to drug court conferences in California and Massachusetts. Respondent repeatedly estimated expenses for herself and other employees and wrote checks for the estimated expenses from the CSP account. None of the recipients was required to track or document his or her spending or reimburse the court for expense payments not used for court-related business. This practice violated Code of Judicial Conduct, Canon 6(B). Drug court conferences were not proper operational expenses of the CSP. It is also worth noting that Inkster has never established a drug court.

[17] Additional expenses included gifts for board members of the Tax Increment Finance Authority, embroidered shirts bearing respondent's name, a court newsletter, funeral flowers, and expenses related to Law Day. None of these was a proper operational expenditure of the CSP.

10

create a budget. However, an October 2007 audit report, which respondent admitted she had read, apprised respondent that state law required a budget for all general and special revenue accounts, including the CSP.[18] Thus, although she had been warned that she was disobeying state law, respondent continued to refuse to establish a budget for the CSP account four years later.

## B. ADMINISTRATIVE IMPROPRIETIES

The master and the JTC found that respondent implemented an unreasonable business-attire policy and allowed it to be enforced at the court, resulting in people being denied access to the court. The Court agrees with this finding.

The respondent instituted the business-attire policy because some people wore clothing in court that inappropriately exposed their bodies or suggested that they belonged to a gang. The policy was intended to apply only to people in the courtroom, not to everyone who wished to enter the courthouse.

However, the record shows that court employees enforced the business-attire policy against everyone who sought entry to the courthouse. There was evidence that litigants were prejudiced by this policy and that some visitors were inappropriately denied access to the courthouse. In her responsive brief, respondent argued that "somehow [the business-attire policy] was improperly enforced . . . ." (Emphasis omitted.) She refused to acknowledge that she alone was responsible for overseeing the

---

[18] The "control deficiency" section of this audit report stated: "No budget was prepared for the Community Service Fund which is a special revenue fund. According to the state budget act, a budget is required for all general and special revenue funds. A budget should be prepared and approved prior to July 1 of each fiscal year."

enforcement of her dress policy in the 22d District Court. The master noted that, although the judicial canons allow a judge to require that certain attire be worn in the courtroom, the requirements must be reasonable.

In addition, respondent simply cannot be allowed to plead ignorance about how her business-attire policy was enforced in the court she controlled. Under the court rules, a "judge is personally responsible for the judge's own behavior and for the proper conduct and administration of the court in which the judge presides."[19] Respondent was the lone judge in her court, and she was responsible for implementing the business-attire policy; therefore, she was responsible for its proper and reasonable enforcement.[20] Respondent should have known that people were appearing for court and being turned away because of her policy. And she should have taken steps to prevent this from happening.

## C. EMPLOYMENT IMPROPRIETIES

The master and the JTC found that respondent knowingly rehired an unqualified magistrate in violation of MCL 600.8501 and MCL 600.8507 and misrepresented that he was qualified.[21] We agree. Even more troubling, respondent required the magistrate to

---

[19] MCR 9.205(A).

[20] The master also found that this conduct violated MCR 9.104(1) because it was prejudicial to the proper administration of justice.

[21] A magistrate is required by MCL 600.8501 and MCL 600.8507 to be a resident and registered elector. Respondent attempted to circumvent these requirements by hiring a magistrate pursuant to a multidistrict plan. The State Court Administrative Office rescinded the appointment because the magistrate did not meet the residency requirements. One month later, respondent reappointed the same magistrate and signed Local Administrative Order 2002-5, attesting that he was a resident and registered elector

12

sign bench warrants in violation of MCL 600.8511.[22]  As a consequence, approximately 15,000 bench warrants were improperly issued and had to be reissued after respondent's suspension.  Respondent testified that she did not instruct the magistrate to sign the warrants.  However, the magistrate testified that signing bench warrants was one of his responsibilities.  Making respondent's contention even less credible is the fact that she was the only person at the 22d District Court who had the legal authority to sign bench warrants.  It is impossible that she would not have noticed the significant drop in the number of warrants she was signing after rehiring this magistrate.

The JTC findings also established that respondent violated the Supreme Court's antinepotism policy by hiring her niece.  The Court's antinepotism policy[23] allows family members to continue working for the court if they were employed by the court at the time the policy was enacted.  Respondent's niece worked for the court when the policy was enacted but later resigned.  About six months later, respondent rehired her niece, which violated the policy.  Respondent claimed that although she knew of the violation, she thought the rehiring complied with a policy of the city of Inkster.  Paradoxically, respondent had told the city that court employees were not subject to the city's employment rules.  Respondent had a duty to contact the State Court Administrative

---

of Inkster.  Respondent argued that she thought the magistrate was qualified.  He testified that he was not a resident of Inkster and was not a registered voter in the city. Respondent failed in her duty to verify this information before she attested to its truthfulness in LAO 2002-5 and before she rehired the magistrate.

[22] MCL 600.8511 permits magistrates to sign arrest warrants, not bench warrants.

[23] Administrative Order No. 1996-11

13

Office to determine the proper course of action when court policy conflicted with the city's policy. She made no effort to do this.

## D. MISREPRESENTATIONS TO THE MASTER AND THE JTC

The master and the JTC found that respondent made misrepresentations during the investigation and the hearing, including lying under oath. This Court agrees with those findings.

In March 2011, using court funds, respondent purchased a $350 airline ticket for herself to attend a judicial conference in California. She did not attend the conference and exchanged the unused ticket for another that she used for a non-court-related trip. Respondent testified before the master that the airline ticket was "worthless." However, the record established that after the airline assessed a penalty of $150, respondent used the remaining $200 toward a $249 plane ticket for personal travel after being suspended from office.

Another incident involved a plane ticket for a conference in Massachusetts. Respondent issued a check from the CSP account to herself for $349.40, which she estimated to be the round-trip cost for the trip. She actually paid $7.50 for the ticket she purchased using frequent-flier miles. It is undisputed that respondent did not reimburse the CSP account for the difference. She testified that she was not overcompensated for her ticket because it would have cost $1,137.50 if she had paid for the 32,500 frequent-flier miles she used to purchase the ticket.[24] However, testimony at the hearing established that frequent-flier miles have no actual cash value because they cannot be

[24] The price for a frequent-flier mile is $0.35.

14

sold or converted for cash. They are more akin to coupons. It was also shown that respondent could have purchased a ticket for much less than $1,137.50. It is apparent that respondent knew this because she wrote herself a check for $349.40, not $1,137.50.

Respondent also testified under oath that after appointing the magistrate she informed him that "he would have to become a registered elector as well as a resident of the city of Inkster." However, the magistrate testified to the contrary, saying that he "never knew" that being a registered elector was a requirement of the position. Moreover, respondent testified that she received a letter from the magistrate confirming his qualifications and attaching a copy of his voter's registration card. However, the magistrate testified that he did not provide such a letter. Moreover, he said that he knew "for certain" that he had never provided a copy of his voter's registration card to respondent because he was never a registered voter in Inkster. The master specifically found the magistrate's testimony "credible" and respondent's testimony "not credible." As the master was in a superior position to observe the witnesses' demeanor and assess their credibility,[25] we are left with the conclusion that respondent lied under oath.

As discussed previously, respondent also denied that she instructed the magistrate to sign bench warrants. However, the magistrate testified that respondent assigned this duty to him. The master specifically found the magistrate's "testimony that Respondent required him to sign bench warrants credible."

Other misrepresentations made by respondent included the following: (1) she denied receiving any personal benefit from the various advertisements she purchased

---

[25] *In re Noecker*, 472 Mich 1, 9-10; 691 NW2d 440 (2005).

with CSP funds, (2) she denied that she was on notice of the requirement to establish a budget for the CSP account, and (3) she denied failing to take appropriate action to recover refunds owing from overpayments for court-related travel.

### III. CONCLUSION

"The purpose of these proceedings is not to impose punishment on the respondent judge, . . . but to protect the people from corruption and abuse on the part of those who wield judicial power."[26] In determining appropriate sanctions, we seek to "restore and maintain the dignity and impartiality of the judiciary and to protect the public."[27]

In a case similar to this one that also involved substantial and pervasive misconduct, we removed a judge from office for the remainder of his term.[28] Judge James's misconduct persisted for years, permeating and infecting every corner of the 22d District Court. For this reason and for the others stated in this opinion, we agree with the JTC's recommendation and order that respondent be removed from office.[29]

The JTC is directed to submit a bill of costs to the Court. It is to include an itemization pursuant to MCR 9.205(B) showing the costs, fees, and expenses incurred by the JTC in prosecuting the complaint.[30] In addition, because certain of the

---

[26] *Jenkins*, 437 Mich at 28.

[27] *Ferrara*, 458 Mich at 372.

[28] *In re Justin*, 490 Mich 394; 809 NW2d 126 (2012).

[29] Respondent is no longer a judicial officer and will not be an incumbent at the time of the 2012 general election for the 22d District Court. See *In re Nettles-Nickerson*, 481 Mich 321, 323; 750 NW2d 560 (2008).

[30] MCR 9.205(B).

16

misappropriated funds were by law to be paid to crime victims, the JTC may specify the amount that respondent should have allotted to victim restitution.[31] Respondent shall be given an opportunity to respond to the bill of costs.

Pursuant to MCR 9.226, the Court will not accept motions for rehearing on the merits of this opinion. The Clerk of the Court is directed to issue the judgment order forthwith in accordance with this opinion and MCR 7.317(C)(3).

Marilyn Kelly
Robert P. Young, Jr.
Stephen J. Markman
Mary Beth Kelly
Brian K. Zahra

CAVANAGH and HATHAWAY, JJ. We concur in the majority's result of removal from office and its decision to direct the Judicial Tenure Commission to submit an itemized bill of costs pursuant to MCR 9.205(B).

Michael F. Cavanagh
Diane M. Hathaway

---

[31] Const 1963, art 6, § 4. The superintending power of the Supreme Court has been interpreted as extremely broad and inclusive:

"It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. . . ."

. . . [I]ts purpose [is] "to keep the courts themselves 'within bounds' and to insure the harmonious working of our judicial system." [*In re Huff*, 352 Mich 402, 417-418; 91 NW 2d 613 (1958) (citations omitted).]

17

S T A T E   O F   M I C H I G A N

SUPREME COURT

In re Honorable SYLVIA A. JAMES,                                No. 143942
Judge, 22d District Court

_____

MARKMAN, J. (*concurring in part and dissenting in part*).

I agree with the majority that Judge Sylvia James used several hundred thousand dollars of public funds as her "personal piggybank," without regard for either the law or the victims of crime within the city of Inkster who were entitled to have received a share of those funds; violated court policy by hiring a family member; and lied under oath during the investigation and hearing conducted by the Judicial Tenure Commission (JTC) and the master appointed in this case. I also agree that this misconduct compels the removal of Judge James from office, as well as the payment of costs and restitution for the funds diverted from the victims of crime within Inkster.

I respectfully disagree, however, that the sanctions imposed on Judge James by the majority sufficiently address the continuing harm that her misconduct has inflicted on the integrity of the judiciary in our state. The Michigan Constitution confers on this Court the duty of exercising superintending control over the lower courts. In my judgment, this responsibility to protect the integrity of our justice system requires in this case that Judge James also be conditionally suspended for a period of six years, or one full term of the court on which she currently presides.

## I. INTEGRITY OF THE JUDICIARY

As Chief Justice Marshall so famously stated in *Marbury v Madison*, 5 US (1 Cranch) 137, 177; 2 L Ed 60 (1803), it is, "emphatically, the province and duty of the judicial department, to say what the law is." This, of course, leads to the question, "Who shall keep the keepers?" *In re Del Rio*, 400 Mich 665, 726; 256 NW2d 727 (1977) (quotation marks and citation omitted). Our state constitution "vests this solemn responsibility" in this Court. *Id.* at 726. Const 1963, art 6, § 4 provides:

> The supreme court shall have general superintending control over all courts; power to issue, hear and determine prerogative and remedial writs; and appellate jurisdiction as provided by the rules of the supreme court.

We observed in *Ransford v Graham,* 374 Mich 104, 108; 131 NW2d 201 (1964), that the power of general superintending control may be exercised "for the purpose of protecting the purity of judicial processes and maintaining public confidence in the administration of justice." As head of the state judiciary, this Court is charged with keeping the courts within bounds and ensuring "'the harmonious working of our judicial system.'" *In re Huff*, 352 Mich 402, 418; 91 NW2d 613 (1958) (citation omitted). This duty to protect the integrity of the judiciary should not be taken lightly and must be considered in all cases involving judicial misconduct. In *In re Probert*, 411 Mich 210, 231; 308 NW2d 773 (1981), this Court stressed that our judicial system "is only as good as its constituent judges." We explained:

> [W]hen one commits judicial misconduct he not only marks himself as a potential subject of judicial discipline, he denigrates an institution. Accordingly, a decision on judicial discipline must also be responsive to a significant institutional consideration, "the preservation of the integrity of the judicial system." Institutional integrity, after all, is at the core of institutional effectiveness.

2

*Id.* at 225.  Indeed, proceedings such as this exist not to punish, but to maintain standards

of judicial fitness.  *In re Mikesell*, 396 Mich 517, 527; 243 NW2d 86 (1976).

Accordingly, the driving force behind judicial discipline is always the preservation of the

integrity of the judicial system:

> The functions and decisions of a judge have an incalculable impact
> on the community at large.  A citizen's experience with the law is often
> confined to contact with the courts.  Therefore, it is important not only that
> the integrity of the judiciary be preserved but that the appearance of that
> integrity be maintained.
>
> \* \* \*
>
> "For generations before and since it has been taught that a judge
> must possess the confidence of the community; that he must not only be
> independent and honest, but, equally important, believed by all men to be
> independent and honest.  A cloud of witnesses testify that 'justice must not
> only be done, it must be seen to be done.'  Without the appearance as well
> as the fact of justice, respect for the law vanishes in a democracy."

*Del Rio*, 400 Mich at 725 (citations omitted).  To accomplish this end, the state and this

Court can prescribe appropriate standards of conduct for those who hold state elective

judicial office.  *Id.* at 683.  These standards, set forth in MCR 9.104 and MCR 9.205,[1] are

designed to preserve judicial integrity by guarding against harmful conduct by those

holding elective judicial office.

Particularly in the circumstances of this case, it bears emphasizing that the elective

nature of the judicial office does not relieve this Court of its duty to preserve the integrity

of the judiciary, nor does the fact of popular election insulate or immunize a judge from

the consequences of his or her misconduct, any more than an elected public official is

---

[1] MCR 9.104 sets forth general grounds for attorney discipline, while MCR 9.205 sets
forth rules of judicial conduct.

3

insulated or immunized by election to office from being held to account for criminal law violations. To be sure, the elective power of the people does include the responsibility to ensure the qualifications of those elected, but they do not bear this responsibility alone.[2] Our Constitution provides that in addition to this responsibility on the part of the electorate, this Court has a separate and distinct duty to uphold the integrity of the judiciary. The people's discharge of their duty through election does not discharge this Court's separate duty to preserve the integrity of the judiciary. Rather, this Court's obligation to maintain the integrity of the judicial branch is indissoluble, and the fact of election does not dispel the harmful effects of judicial misconduct, either within or beyond the boundaries of the election district.

As noted, our Constitution vests in this Court the primary responsibility to "keep the keepers." The people are entitled to a judiciary of the highest integrity, in both appearance and in fact, and this Court always bears the obligation under the constitution adopted by "we the people" to maintain and enforce standards of judicial fitness.

## II. POWER OF THE COURT

This Court's authority to sanction a judge can be found in Const 1963, art 6, §§ 4 and 30. While § 4 provides this Court's general superintending authority over courts, § 30(2) provides, in relevant part:

> On recommendation of the judicial tenure commission, the supreme court may censure, suspend with or without salary, retire or remove a judge

---

[2] The people's right to the service of a judge whom they have elected is also not absolute, but "is subject to express and distinct limitations and qualifications provided for by the Constitution and statutes." *Del Rio*, 400 Mich at 685 n 6; see also *Huff*, 352 Mich at 414.

4

for conviction of a felony, physical or mental disability which prevents the performance of judicial duties, misconduct in office, persistent failure to perform his duties, habitual intemperance or conduct that is clearly prejudicial to the administration of justice.

Furthermore, the JTC's specific recommendation is not binding upon this Court. MCR 9.225 provides, in relevant part:

> The Supreme Court shall review the record of the proceedings and file a written opinion and judgment, which may accept or reject the recommendations of the commission, or modify the recommendations by imposing a greater, lesser, or entirely different sanction.

In other words, the fact that the JTC did not recommend a particular sanction does not preclude this Court from imposing what it determines to be an appropriate and proportionate sanction. Thus, the only limitation on this Court's authority to redress judicial misconduct in article 6, § 4 is that this Court may not use § 4 power to remove a judge, although we may remove a judge upon a disciplinary recommendation of the JTC under article 6, § 30. In fact, the superintending control power vested by § 4 is extremely broad:

> "The power of superintending control is an extraordinary power. It is hampered by no specific rules or means for its exercise. It is so general and comprehensive that its complete and full extent and use have practically hitherto not been fully and completely known and exemplified. It is unlimited, being bounded only by the exigencies which call for its exercise. As new instances of these occur, it will be found able to cope with them. Moreover, if required, the tribunals having authority to exercise it will, by virtue of it, possess the power to invent, frame, and formulate new and additional means, writs, and processes whereby it may be exerted. This power is not limited by forms of procedure or by the writ used for its exercise."

*Huff*, 352 Mich at 417-418 (citation omitted); see also *In re Hathaway*, 464 Mich 672, 684 n 8; 630 NW2d 850 (2001).

5

Suspension from office is one sanction expressly listed in Const 1963, art 6, § 30. This Court has clarified that "suspension," which is an "'ad interim stoppage or arrest of official power and pay,'" is not synonymous with "removal," which "'terminates wholly the incumbency of the office or employment.'" *Probert*, 411 Mich at 229 n 11, quoting Black's Law Dictionary (4th rev ed), p 1616. Further, "[n]either 'suspension' nor 'removal' connotes a *permanent* disqualification from office." *Probert*, 411 Mich at 229 n 11 (emphasis in original). The power to suspend is also not limited to cases in which the judge currently holds judicial office. As this Court noted in *Probert*, we possess the authority under the constitution to issue conditional suspensions that "foreclose[] the exercise of the prerogatives inhering in any judicial office to which the disciplined party might have been elected or appointed in the future, the condition being, of course, re-election or appointment to judicial office." *Id*. at 224, citing *Mikesell*, 396 Mich at 549, *Del Rio*, 400 Mich at 672 nn 3 and 4, and *In re Bennett*, 403 Mich 178, 200; 267 NW2d 914 (1978).

Such conditional suspensions "disengage the disciplined party from judicial power" only if the person occupies judicial office again during the term of the suspension and do not permanently enjoin the person from holding judicial office. *Probert*, 411 Mich at 224, 232-233. This Court has historically issued conditional suspensions when other sanctions could not fully and adequately address the effect of particular misconduct on the integrity of the judicial system. See *id.* at 225-228; *Del Rio*, 400 Mich at 725-726. Although often the greatest danger will pass once "an unfit or incompetent judge is separated from judicial power," this Court should not refuse to consider other sanctions,

6

such as conditional suspensions, when removal alone cannot sufficiently protect the integrity of the judiciary. *Probert*, 411 Mich at 227-228.

## III. APPLICATION

Turning to the matter now before this Court, I believe that any sanction imposed must address not only the immediate effects of Judge James' misconduct, but also the extent of the harm she has done to the integrity of the judicial system and the likelihood that the harm will continue. In *Probert*, 411 Mich at 228 n 10, we set forth a number of factors to consider in determining the appropriateness of a sanction that operates after a judge has left judicial office: (1) the likelihood of reelection to judicial office, (2) the gravity of the misconduct, and (3) the importance of official reprobation to public confidence and trust in the integrity of the judicial system. Consideration of these factors, along with the specific details of Judge James' misconduct in the instant case, leads inescapably, in my judgment, to the conclusion that removal and restitution alone cannot fully and adequately redress the harm that she has caused to the integrity of the judiciary. Accordingly, I would impose on her a six-year conditional suspension in addition to the removal imposed by the majority and the itemization of costs it has ordered.

In *In re Brown*, 461 Mich 1291, 1292-1293 (2000), this Court provided seven factors to guide the formation of judicial-discipline recommendations. This case, I believe, implicates the following *Brown* factors, all weighing in on the "more serious" side of the scale: (1) misconduct that is part of a pattern or practice, (2) misconduct that is prejudicial to the actual administration of the justice, (3) misconduct giving the appearance of impropriety, and (4) misconduct that is premeditated or deliberated. After

7

considering these factors, I cannot agree with the majority that removal alone constitutes an appropriate response to the seriousness of the misconduct at issue.

The evidence clearly establishes that Judge James' misconduct was prejudicial to the actual administration of justice, as her private use of hundreds of thousands of dollars of public funds prevented those funds from being used for their proper purposes, including provisions of assistance for the victims of crime within Inkster. As the majority has detailed, Judge James treated public funds, including funds statutorily required to go to victims of crime, as her own "publicly-funded, private charitable foundation" of which she was the sole administrator. In so doing, Judge James routinely ignored or circumvented legal requirements that conflicted with her own personal desires. Although Judge James places great importance on the fact that she provided some of the misappropriated funds to worthy charitable or civic organizations, she fails to acknowledge that her "contributions" invariably served her own electoral purposes as well and were sometimes the equivalent of publicly-subsidized campaign advertisements.[3] And not all the money, by any means, was given to such organizations. Instead, Judge James also used public funds to pay for improper travel and, among other things, provide gifts to other public officials who had undertaken actions favorable to her court.

---

[3] Judge James improperly authorized at least 47 checks (totaling more than $13,000) from public funds to charitable, civic, fraternal, and religious organizations. In every instance, the contribution predominately promoted Judge James, not the public mission of the court or any particular court program.

Moreover, Judge James continues to fail to acknowledge that she possessed no authority to expend public monies in violation of the law.[4]  Rather, she was entrusted, both through her office and by statute, to distribute those funds according to the laws enacted by the elected representatives of the people of Inkster and those of all other residents of this state.  In so doing, Judge James placed her own desires and preferences above the law, and above the rights of the victims of crimes within the city of Inkster who were entitled to these funds by the laws Judge James chose to ignore.  This refusal to be bound by the law effectively resulted in these victims of crime being victimized twice-- once by the criminal perpetrator and a second time by the very judicial body in which they sought justice and restitution.[5]

---

[4] If a bank teller, for example, accepted a check and deposited the check into her favorite charitable account instead of depositing the funds into the account specified on the check, the fact that the misdirected funds were given to a worthy charity would not justify the teller's misconduct of using someone else's money for her own private purposes.  Judge James does not seem to clearly apprehend this and continues to justify her actions on the ground that she did not directly put the money in her pocket.  This was the crux of her defense at the JTC and before this Court.

[5] Judge James' refusal to consider both the propriety and the effect of her actions was also evident in her employment of a family member in violation of an antinepotism policy and her institution and enforcement of a dubious business-attire policy for the public.  After instituting this policy, Judge James ignored the fact that both the policy and its enforcement by court staff had the effect of denying some members of the public access to the court.  Importantly, this denial of access went beyond unnecessarily inconveniencing members of the public; in at least one instance, court staff prevented a party to a case from entering the building even to reschedule his hearing, resulting in a default judgment being entered against him while he stood helplessly outside.  It is a Kafkaesque world indeed when a citizen has a judgment entered against him for failure to appear by the very same court that prohibited his appearance in the first place.

Her improper institution and enforcement of the business-attire policy were also prejudicial to the administration of justice, barring litigants' access to the justice system itself. Her improper hiring of her niece, in violation of the court's antinepotism policy, also communicated the appearance of impropriety. And virtually all of her misconduct was thoroughly deliberate and premeditated, requiring that policies be instituted, computer systems be overridden, expenditures be planned and implemented, records be distorted, long-range travel plans be undertaken, and ways be devised to ensure unchecked and improper access to public funds.

But the most disturbing factor, and the one that arguably presents the greatest danger to the integrity of the judiciary, is that Judge James' misconduct was part of an enduring pattern or practice that she has shown no intention of changing. Her behavior and statements before, during, and after the investigation and hearing demonstrate that Judge James refuses to be bound by any law or requirement that conflicts with her own desires. This sustained pattern of misconduct and disregard for the law precludes, in my judgment, sympathetic consideration of Judge James' behavior. "We simply cannot overlook a disclosed pattern [of misconduct]. Once such pattern is discovered, the opportunity of continuity thereof must be concluded with firmness and resolution." *In re Graham*, 366 Mich 268, 276; 114 NW2d 333 (1962). In this case, removal alone, which may accomplish nothing more than removing her from the bench for a period of fewer than five months, will not divest from Judge James all opportunity to continue her pattern of misconduct and her cavalier approach to her responsibilities as a district judge.

The inadequacy of removal is further demonstrated by Judge James' practice of being unrestrained by her oath to tell the truth. During the course of this investigation

10

and hearing, Judge James lied numerous times. For example, Judge James not only falsely stated that a candidate was qualified to be magistrate, she then continued to lie when confronted about the first falsehood. Judge James further lied in stating that it was the funding authority that issued the improper checks, not her. The funding authority, however, never administered or managed the account from which the checks were drawn. In fact, Judge James opened the account when the funding authority questioned some of her check requests. Judge James also falsely submitted in her answer that the decision to close the court bank accounts was made by the bank and that the decision "forced" her court administrator to obtain a new federal tax identification number and open new accounts elsewhere. A letter from the court administrator to the bank (directed by Judge James) clearly stated that the decision was the "court's and not the bank's." Further, Judge James instructed her administrator to obtain a new tax identification number before the accounts at the bank were closed.

Judge James also falsely stated that she derived no benefit from the issuance of the various checks to the civic and charitable organizations, when the advertisements prominently featured her name and photograph and had the appearance of campaign literature. Similarly, Judge James falsely submitted in her answer that she was only an honorary member of the Booker & Flora Dozier Memorial Scholarship organization (one of the organizations to which she improperly directed public funds), when she actually served as a committee member and voted on which applications should receive scholarships. Judge James also falsely stated that she was not an active member of the Delta Sigma Theta sorority (another organization that received public funds from Judge James), when in fact she is a lifetime member. Finally, Judge James lied about

reimbursements she had received for travel expenses and pocketed public monies in excess of the actual costs. Thus, Judge James not only received an improper monetary benefit, but she lied about it when this was brought to her attention.

The provision of false testimony or evidence in a JTC proceeding has generally led to removal from office. *In re Servaas*, 484 Mich 634, 716 n 11; 774 NW2d 46 (2009) (YOUNG, J., dissenting). This Court also explained the importance of truthfulness in *In re Ferrara*, 458 Mich 350, 372; 582 NW2d 817 (1998):

> Judges, occupying the watchtower of our system of justice, should preserve, if not uplift, the standard of truth, not trample it underfoot or hide in its shady recesses. This is precisely why judges should be exemplars of respectful, forthright, and appropriate conduct.

Lying under oath is the antithesis of judicial integrity. When faced with such misconduct, this Court must take pains to adequately address the harm inflicted and protected against future harm if necessary. See *In re Ryman*, 394 Mich 637; 232 NW2d 178 (1975); *In re Loyd*, 424 Mich 514; 384 NW2d 9 (1986); *Ferrara*, 458 Mich 350; *In re Noecker*, 472 Mich 1; 691 NW2d 440 (2005); *In re Nettles–Nickerson*, 481 Mich 321; 750 NW2d 560 (2008).

I agree with the Judicial Tenure Commission and the majority opinion that Judge James' misconduct violated Const 1963, art 6, § 30, MCR 9.104(A)(1) (conduct prejudicial to the proper administration of justice); MCR 9.104(A)(2) (conduct that exposes the legal profession or the courts to obloquy, contempt, censure, or reproach); MCR 9.205(A) (a judge is personally responsible for the judge's own behavior and for the proper conduct and administration of the court in which the judge presides); MCR 9.205(B)(1) (misconduct in office); Code of Judicial Conduct, Canons 1 (uphold the

integrity and independence of the judiciary), 2(A) (avoid all impropriety and appearance of impropriety), 2(B) (respect and observe the law), 2(C) (not allow family, social, or other relationships to influence judicial conduct or judgment), 3(A)(1) (be faithful to the law and maintain professional competence in it and be unswayed by partisan interests, public clamor, or fear of criticism), 3(A)(2) (enforce reasonable rules of attire and conduct in the courtroom.), 3(B)(1) (diligently discharge administrative responsibilities, maintain professional competence in judicial administration, and facilitate the performance of the administrative responsibilities of other judges and court officials.), and 6(B) (expense reimbursement limited to the actual cost of travel, food, and lodging reasonably incurred by the judge); MCL 600.4803 (court must transmit to the treasurer or chief financial officer of the funding unit of the court late penalties received within 30 days after receipt of the penalty); MCL 600.8379 (proper allocation of fines and costs); MCL 600.8501 (appointment of magistrates); MCL 600.8507 (qualifications of magistrates); MCL 750.174 (embezzlement by fiduciary); MCL 750.175 (embezzlement by public officer); MCL 750.218 (use of false pretenses with intent to defraud); MCL 750.249 (uttering and publishing); and Administrative Order 1996-11 (antinepotism policy).

Underlying this misconduct, however, is a common theme: Judge James' refusal to conform her actions to the requirements of the law, a law to which she was bound, as are all other citizens. Judge James' actions, in short, that she believed she was *above* the law and not *within* the law. Her actions demonstrate a pattern of ignoring laws or requirements that conflicted with her personal desires and judgment. Even more troubling, her actions during the investigation and hearing below demonstrate a complete

13

lack of remorse or acknowledgement of wrongdoing.  Nowhere in the record does Judge James concede that her actions and decisions were inappropriate and unlawful; instead, she repeatedly attempted to justify her misconduct, arguing that no one had previously complained of the improprieties, that she was not aware of the legal requirements,[6] that others were to blame for her actions, that she was not responsible for the actions of her court staff, and that any ancillary benefit to charitable or civic organizations justified her actions.

Taken together, these justifications reveal a refusal to conform her actions to the requirements of the law, as if statutory requirements and judicial canons are mere suggestions that may be regarded or disregarded at her will.  It is this refusal to be bound by the laws of this state that, in my opinion, poses the greatest harm to the integrity of the judiciary and must therefore be effectively addressed.

Although the majority's ordering removal from office addresses the immediate harm caused by Judge James, it is an inadequate response and fails to address the likelihood of continuing harm.  As a result of the majority's decision, Judge James will be removed from office from today's date until the expiration of her present term at the end of 2012.  She has her name on the August primary ballot, however.  If she is successful in the primary, her name will be placed on the ballot for the general election in November.  And should she prevail in those elections, she will be allowed to resume her judgeship on January 1, 2013.

---

[6] Aside from the fact that Judge James was, in fact, informed of both the law and her noncompliance, her assertion that a judge has no duty to know the law governing the judge's day-to-day responsibilities and actions defies logic.

14

In sum, following today's decision: (1) Judge James will appear and be designated as a "judge" on the August 7 primary ballot, (2) if Judge James is among the top two finishers in that primary, she will stand for reelection on November 6, although no longer designated as the incumbent "judge," (3) Judge James will be allowed to campaign continuously for judicial office between the time of today's decision and the November election, referring to herself if she chooses as a "past chief judge" or as "former judge," and (4) if Judge James is reelected in November, she will be allowed to retake office and serve the next six-year term of the court beginning on January 1 of next year. And whether by that time Judge James has or has not made full restitution to the city of Inkster or to individual victims of crime within Inkster, she may resume her "public service" after a "removal" from judicial office of less than five months. Such a sanction is inadequate, in my judgment, and does not satisfy what I view as this Court's obligation under our superintending authority over the judiciary to preserve the integrity of Michigan's courts.

Given Judge James' lack of remorse and continuing refusal to acknowledge that she too is bound by the laws of this state, there is no reason to believe that Judge James will not continue to place her own will above the will of the people. Again, it is of no moment for what constitutes a proportionate sanction against Judge James that she may again be elected to judicial office this year. The harmful effect of her misconduct on the judiciary extends beyond the geographical limits of her judicial district, and this Court must ensure that our sanctions for judicial misconduct are viewed as adequate in Alpena and Muskegon and Battle Creek, as well as in Inkster. And a victim of crime within Inkster who was due restitution from the fund depleted by Judge James is entitled to an

15

honest court in Inkster whether her or she has come into that community from Dearborn or Wyandotte or Trenton. Const 1963, art 6, § 1 proclaims that there is but "one court of justice" in this state, and the actions of Judge James have implications for the reputation and integrity of the judiciary throughout our state.

This Court has a duty to redress the harms done by Judge James' harm, and that duty is not vitiated if Judge James is reelected. Nor is that duty limited to past harm; rather, it also extends to guarding against future harm. Imposing a six-year conditional suspension, which would be in effect throughout the next judicial term, is the only way this Court can adequately protect judicial integrity and redress the substantial harm caused by Judge James's refusal to be bound by the same laws she is charged with applying.

## IV. CONCLUSION

Although I concur with the majority that Judge James's misconduct warrants removal and the payment of restitution for the diversion of public funds into her "personal piggybank" and as part of her "publicly-funded private foundation," I do not think that this sanction sufficiently addresses the harm done to the integrity of the judiciary. In light of this Court's responsibility to ensure the integrity of our judicial system, both in appearance and in fact, and in light of the serious misconduct by Judge James that directly impugns the integrity of our "one court of justice" and because of her serious abuse of the public trust, financial and otherwise, I would impose a six-year conditional suspension in addition to the sanctions imposed by the majority.

Stephen J. Markman
Robert P. Young, Jr.

16